No. 38,880

THE CITIES OF MCPHERSON, et al., *Appellees*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, et al., *Appellants*, and THE KANSAS POWER AND LIGHT COMPANY, *Appellant*.

NATIONAL GYPSUM COMPANY, *Appellee*, v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, et al., *Appellants*, and THE KANSAS POWER AND LIGHT COMPANY, *Appellant*.

(257 P. 2d 123)

(Consolidated)

Opinion filed May 9, 1953.

*Jay Kyle*, of Topeka, argued the cause, and *Robert M. Corbett*, of Topeka, was with him on the briefs for the appellant, State Corporation Commission of the State of Kansas.

*Clayton E. Kline*, of Topeka, argued the cause, and *M. F. Cosgrove, Balfour S. Jeffrey*, and *Robert E. Russell*, all of Topeka, were with him on the briefs for the appellant, The Kansas Power and Light Company.

*Jerome M. Joffee*, of Kansas City, Mo., argued the cause, and *Russ B. Anderson*, city attorney, of McPherson, and *Charles C. Calkin*, of Kingman, were with him on the briefs for the appellee cities.

*Harry W. Colmery* and *James E. Smith*, both of Topeka, and *Paul R. Wunsch*, of Kingman, were on the briefs for the appellee, National Gypsum Company.

The opinion of the court was delivered by

HARVEY, C. J.: These appeals are from orders of the trial court sustaining motions of the appellees to set aside orders of the State Corporation Commission as being unlawful and unreasonable on their face without an examination of the record before the Commission required by G. S. 1949, 66-118d.

The legislature, by statute (G. S. 1949, 74-601), organized the State Corporation Commission, which hereinafter will be called the "Commission," and by chapter 66, Laws of 1949, gave the Commission full power, authority and jurisdiction to supervise and control public utilities, as defined by the act, doing business in this state, and empowered it to do all things necessary and convenient

for the exercise of such power, authority and jurisdiction. The Kansas Power and Light Company, hereinafter called the "Company," is a public utility as defined by the act (G. S. 1949, 66-104). It is a Kansas corporation. Its business is confined to Kansas. A part of its business is to generate electricity, which it distributes to various places in the state for sale. This part of its business is not involved here. As a part of its business it purchases natural gas from producers or pipe lines, which it sells to various cities and industries.

The Company has three separate gas systems. *First,* it distributes gas to Atchison, Leavenworth, Lansing and Emporia, and for this it obtains its supply of gas wholesale from the Cities Service Gas Company, which delivers the gas at the town borders. This system is not involved here. *Second,* it distributes gas in fifteen Kansas cities located along the line of the Northern Natural Gas Company, from which it purchases the gas wholesale at the city gates. Only as it pertains to the proposed increases in industrial rates is this system directly concerned. *Third,* it maintains a main transmission system from the Hugoton gas field, which it owns and operates and from which it distributes gas to 107 cities in Kansas. This is not connected with either the first or the second system above mentioned. It is the one involved here.

On November 24, 1951, the Company filed with the Commission, under G. S. 1949, 66-117, an application requesting the consent of the Commission to file and place in effect certain changed schedules of rates to be charged for natural gas which affected only two classes of rates: (1) Since 1931 the Company had on file and in effect its general gas rate schedule known as GG-6, which covered its charges for natural gas for domestic and commercial purposes, to all its customers served from its main transmission system, with the exception of fifteen named cities, which fifteen cities, while being served from the Company's main transmission system had been receiving gas at rates lower than those contained in Schedule GG-6, by reason of their proximity to local gas fields which had been exhausted. The application requested the Commission to place these cities and their inhabitants on the same schedule of rates in effect in the other ninety-two cities served by the company on its main transmission system, eliminating an existing discrimination in their favor. (2) To replace its present industrial rate schedule, known as the Company's Schedule OCG-2, which, with slight amendments, has been in effect since 1931, by the filing and placing

into effect a new interruptible contract gas rate schedule designated as ICG-1.

These requests were of a character that the Commission could have given or withheld its consent without a hearing. (See, *Wichita R. R. v. Pub. Util. Comm.*, 260 U. S. 48, 56, 43 S. Ct. 51, 54, 67 L. Ed. 124, 129.) Counsel for appellees frankly admit this to be true. In *State, ex rel., v. Postal Telegraph Co.*, 96 Kan. 298, 306, 150 Pac. 544, 548, speaking of the procedure in such a case, the court used this language:

"All that was necessary for the defendant to do was to make application to the commission, setting up the facts. It would then be the duty of the commission to verify the facts by proper investigation; and if the alleged facts were true and no other lawful interest was materially affected, the commission would be bound to grant the application."

Since the application involved numerous users of gas the Commission concluded to have a hearing and gave notice for a hearing on December 19, 1951. At that time representatives of twelve of the cities which previously had been receiving gas from the Company at a rate lower than its GG-6 schedule and some of the users of gas for industrial purposes, including the National Gypsum Company, appeared and asked for further time for preparation for the hearing. The Commission granted these requests and set the hearing for March 3, 1952, on which date and the two days following the hearing was held. At this hearing testimony was taken which made a record of 426 pages of transcript and forty-nine exhibits. At the close of the hearing the Commission took the matter under advisement and on April 30, 1952, filed its order, a copy of which is hereto attached and marked "Appendix A," giving its consent to the putting in of the rates as requested by the Company. On the same date the Commission filed its memorandum opinion stating the pertinent facts and giving the reasons which prompted it to consent to the Company's application. This opinion is hereto attached and marked "Appendix B."

The protesting cities and the National Gypsum Company, an industrial gas consumer, filed motions for rehearing. These were duly heard by the Commission and overruled. Within due time and on June 9, 1952, the twelve protesting cities and the National Gypsum Company, proceeding under our statute (G. S. 1949, 66-118c), filed their respective applications for review in the district court of Kingman county and on the same date filed in that court motions for immediate reversal of the order of the Commission of April 30, 1952,

and gave notice of the hearing of such motions on June 19, 1952. The clerk of the district court of Kingman county duly notified the Commission and the Company of the filing of the petitions for review and of the motions and of the date the motions were noticed to be heard. On June 19, 1952, the Commission appeared by its counsel; also the Company appeared and asked leave to intervene in opposition to the motions, which leave was granted.

The transcript of the hearing before the Commission had not been filed in the district court. The motions for immediate reversal of the order of the Commission made on April 30, 1952, were taken up for hearing. After the argument the court made an oral decision in open court, which was recorded as a part of the case and constituted the findings of fact and conclusions of law of the court. A copy is attached as "Appendix C." These were incorporated in and made a part of the journal entry. The court found that the order of the Commission of April 30, 1952, "is unlawful and unreasonable in its entirety and should be vacated and set aside." Judgment was rendered accordingly. The court further adjudged that the proceedings and judgment of the court should be transmitted by its clerk to the Commission. The Commission and the Company each filed a motion for a new trial, which were considered by the court and overruled.

We turn now to the legal questions presented here. Counsel for the respective appellants contend the trial court did not follow the procedure outlined by our statute, but adopted a procedure of its own, that it considered matters not before it, and that its conclusions were erroneous.

The pertinent sections of our statute, all in G. S. 1949, outlining the procedure and describing the duties of the district court in a case such as this, may be summarized or quoted in whole or in part as follows:

66-118c outlines the procedure for review by the district court of decisions of the Corporation Commission. This procedure was followed and the matter was properly taken to the district court for review, and the Commission and interested parties were given notice as provided in that section.

66-118d reads as follows:

"The secretary upon receipt of said copy of the application for review shall forthwith transmit to the clerk of the district court in which the application for review has been filed, a certified transcript of all pleadings, applications, proceedings, orders or decisions of the commission and of the evidence heard

by the commission on the hearings of the matter or cause: *Provided,* That the parties, with the consent and approval of the commission, may stipulate in writing that only certain portions of the record be transcribed. Said proceedings for review shall be for the purpose of having the lawfulness or reasonableness of the original order or decision or the order or decision on rehearing inquired into and determined, and the district court hearing said cause shall have the power to vacate or set aside such order or decision on the ground that such order or decision is unlawful or unreasonable. After the said transcript shall be filed in the office of the clerk of the district court of the county in which the application is filed, the judge of said district court may, on his motion, or on application of any of the parties interested therein, make an order fixing a time for the filing of abstracts and briefs and shall fix a day for the hearing of such cause. All proceedings under this section shall have precedence in any court in which they may be pending, and the hearing of the cause shall be by the court without the intervention of a jury. The procedure upon the trial of such proceedings in the district court and upon appeal to the supreme court of this state shall be the same as in other civil actions, except as herein provided. *No court of this state shall have power to set aside, modify or vacate any order or decision of the commission, except as herein provided."* (Our emphasis.)

66-118f in part reads:

"No new or additional evidence may be introduced upon the trial or any proceedings for review under the provisions of this act, *but the cause shall be heard upon the questions of fact and law presented by the evidence and exhibits introduced before the commission and certified by it:"* (Our emphasis.)

66-118k in part reads:

"If the court shall find that the order or decision of the state corporation commission is unlawful or unreasonable in whole or in part and shall vacate or set aside the order or decision in whole or in part, *the court shall make findings of fact* and conclusions of law, . . ." (Our emphasis.)

Counsel for appellants contend the trial court had no jurisdiction to entertain appellees' motions without having before it the transcript of the proceedings before the Commission. The point is well taken. Our district courts have only such jurisdiction as may be provided by the legislature. (Const. Art. 3, § 6.) Here the legislature outlined the procedure before the court and specifically provided that, "No court of this state shall have power to set aside, modify or vacate any order or decision of the commission, except as herein provided." Several of our cases have thoroughly discussed the procedure of the district court in such matters. (See *Southern Kansas Stage Lines Co. v. Public Service Comm.,* 135 Kan. 657, 11 P. 2d 985; *Union Pac. Rld. Co. v. State Corporation Commission,* 165 Kan. 368, 194 P. 2d 939; *White Eagle Oil Co. v. State Corporation Comm.,* 168 Kan. 548, 554, 214 P. 2d 337, considering another statute having the same con-

ditions (see *Wakefield v. State Corporation Comm.,* 151 Kan. 1003, 101 P. 2d 880); *Rock Island Motor Transit Co. v. State Corporation Comm.,* 169 Kan. 487, 219 P. 2d 405.)

Counsel for appellees cite *Atchison, T. & S. F. Rld. Co. v. State Corporation Commission,* 166 Kan. 548, 203 P. 2d 211, as a case in which the trial court and this court passed upon an order of the Commission upon a motion. In that case, however, there was a transcript filed by the Commission with the district court (p. 550). A re-examination of the abstract and briefs in that case discloses that counsel for appellant so stated on page 7 of its brief and the appellee so stated on page 4 of its brief. The record also discloses that the trial court considered the Commission's transcript. It is true that there were two or more motions in that case which were ruled upon by the trial court and this court, but the case is not an authority for the hearing of motions to set aside the decision of the Commission when the district court has no transcript before it.

Counsel for appellees further contend that in this case the filing of the Commission's transcript with the district court was waived by a stipulation, shown in the journal entry. We think that point is not well taken. The stipulation says nothing about waiving the filing of the transcript before the hearing upon the motion. Obviously the trial court did not consider it was waived, for in the second paragraph of its oral findings it treated that subject and held that it had authority to proceed without the transcript being filed. More than that, the parties to an action cannot waive the jurisdiction of the court as to subject matter of the action. (See, *Behee v. Beem,* 156 Kan. 115, syl. 3, 131 P. 2d 675, and the authorities cited therein.)

Counsel for appellants further contend the court was not justified in its conclusion that the Commission's hearing was held under G. S. 1949, 66-110, which provides for a full hearing for the purpose of fixing a rate base. This point is well taken. Clearly, the Company's application to the Commission was made under G. S. 1949, 66-117. The application was for the consent of the Commission to put in certain schedules of rates. As previously stated here, the Commission could have given or could have withheld its consent without a hearing, but as stated in *State, ex rel., v. Postal Telegraph Co.,* supra, it was the duty of the Commission to verify the facts stated in the application. Certainly if the Commission thought it appropriate to have a hearing for that purpose it had authority to do so. The Commission specifically stated in its memorandum opinion

that it was not conducting a hearing for the making of a rate base. The court was not justified in construing the action of the Commission as being something which the Commission had not done. Neither was it justified in holding that the Commission could not determine whether it would consent to or withhold its consent to the application made to it by the Company without a hearing under 66-110 and determining a rate base. The jurisdiction of the court was to review what the Commission had done. That is all it had authority to do.

Counsel for appellees cite *Southwestern Bell Tel. Co. v. State Corporation Comm.*, 169 Kan. 457, 219 P. 2d 361, as authority for the trial court in this case to consider an application to put in a schedule of rates filed under 66-117, to be heard before the Commission under 66-110. The case is not in point here. In that case Southwestern did file its schedule of rates under 66-117, but its application to put the rates into effect disclosed on its face that the hearing of the application and the making of the order would require an examination of the existing rates, the assets, and income of the application. As a result of this, as shown on page 459 of the opinion:

"Southwestern and the Commission entered into a stipulation which authorized and permitted the latter, on October 9, 1947, to issue an order wherein it found: that in order to determine the issues raised by the application and to carry out the duties imposed upon it by law it was necessary for it to investigate all of the operations of Southwestern, its affiliates, subsidiaries and other members or segments of the Bell system which affect the rates and charges now or to be made applicable within the state, and to appraise the property wherever located which affects the determination or establishment of just or reasonable charges within the exchanges covered by Southwestern's application; that the costs and expenses necessarily incurred in the making of or reasonably attributable to such investigation and appraisal should be assessed against Southwestern; that in making such investigation, appraisal and all proceedings involved, the Commission should exercise the power and authority conferred upon it by G. S. 1935, chapter 66; and directed that the investigation be initiated and carried out for the purpose and in the manner set forth in such findings."

This order also provided that the expense of the hearing should be paid by the applicant, as authorized by 66-1502. No such situation existed in this case. Since the transcript of the proceedings before the Commission was not before the trial court it has not been abstracted, so we are handicapped, as was the trial court, in knowing all that transpired before the Commission. From the order of the Commission and its memorandum opinion, which were

before the trial court and are abstracted here, it seems clear that no question concerning the lawfulness or reasonableness of the rates charged by the Company to the consumers of gas in the 92 cities on the Company's main transmission line was involved in the hearing. The trial court was not justified in considering the question of the lawfulness and reasonableness of the rates charged by the Company in those ninety-two cities. Its function was to consider what the Commission had considered, not to inject its own views into what should have been considered by the Commission. The court had no authority under the statute to review the work of the Commission except in the manner and to the extent the statute gave it such authority. It was error to do otherwise.

In paragraphs 11 and 12 of the Commission's order the Commission found some unaccounted for gas and some interdepartmental transactions of gas between the gas and electric departments of the Company which it desired to further investigate. It transferred these matters to its docket No. 43579-U for hearing under 66-110 and 66-1501. The trial court was of the opinion that those matters should be heard before the Commission should give its consent to the application made by the Company. In this the court erred, for two reasons: *First,* it is the function of the Commission to determine when and under what doctrine those matters should be heard. The court is given no authority to determine that question; and, *second,* any modification of the rates as a result of such hearing would affect the users of gas in all of the 107 cities serviced by the Company on its main transmission line and would not be applicable to the 15 cities alone which previously had enjoyed a lower rate.

In the oral statement made by the court, later characterized as its findings, the court said nothing to indicate the invalidity or unreasonableness of the interruptible industrial contract gas rate schedule (ICG-1) which the Company had asked the consent of the Commission to put into effect, and which consent was granted. Notwithstanding that, the court set aside as unlawful and unreasonable the order of the Commission respecting that matter. We see nothing in this record that justified that action by the court.

There is another matter which we think worth while to note. The portion of the statute (66-118k) previously quoted, requires the trial court, when it reverses an order of the Commission in whole or in part, to make "findings of fact and conclusions of law." The oral statement made by the court in this case, later designated

as findings of fact, can hardly be said to comply with the statute. Much of it is argumentative and some of it deals with matters not included in the order or in the memorandum opinion of the Commission. This procedure was inaccurate.

The result is that the judgment of the trial court must be reversed. It is so ordered.

---

## "APPENDIX A"

BEFORE THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS

In the matter of the application of The Kansas Power and Light Company for consent of the Commission to make certain changes in its charges for natural gas service.—Docket No. 42,829-U.

### ORDER

Now on this 30th day of April, 1952, the above-entitled matter comes before the Commission for further consideration and final disposition. The Commission, having examined the application, files and record and being fully advised in the premises, finds:

1. That the application herein was filed on the 24th day of November, 1951; it is an application for authority to file and to place into effect certain schedules of gas rates which are two-fold in purpose and will be referred to in Findings No. 4 and 5; that the applicant is a public utility engaged exclusively in business in this state, which business includes, *inter alia*, the transmission and distribution of natural gas at both wholesale and retail; that pursuant to notice, a hearing was held on the application on December 19, 1951, and March 3, 4 and 5, 1952, at the Commission's hearing room in Topeka, Kansas. Appearances were entered on behalf of the applicant by Clayton E. Kline and Balfour S. Jeffrey, its attorneys. The cities entering appearances were McPherson, by Russ Anderson, its attorney; Hoisington by J. L. Griffith, its attorney; Lindsborg by E. W. Jernberg, its attorney; Pratt by John D. Megaffin, its attorney; Great Bend, Buhler and Ellinwood by Barton Carothers, their attorney; Canton and Inman by George R. Lehmberg, their attorney; St. John and Macksville by Jack Copeland, their attorney; La Crosse by Neil Hotchkiss and R. W. Johnson, its attorneys; Clay Center by H. L. Sheppeard, its attorney; and Jerome M. Joffee, Kansas City, Missouri, for the interested cities. The Pratt Chamber of Commerce appeared by B. V. Hampton, its attorney and the city of

Kinsley was represented by Albert E. Wilson, its city manager and the city of Greensburg by Fred E. Heinze, its mayor. Further appearances were James E. Smith and Harry W. Colmery, attorneys for the National Gypsum Company, Medicine Lodge, and Arthur L. Claussen, attorney for the Kaw Dehydrating Company, Topeka; Junction City Dehydrating Company, Junction City; and R. and W. Alfalfa Mills, Wamego. Jay Kyle, General Counsel, appeared for the Commission and the public generally.

2. Since 1944, the applicant has had on file its general gas rate schedule known as GG-6, which generally is in effect throughout its gas properties in Kansas with certain exceptions.

3. The cities of Kingman, McPherson, Pratt, Buhler, Canton, Ellinwood, Galva, Great Bend, Hoisington, Inman, Kinsley, La Crosse, Larned, Lindsborg and Marquette, that are on the applicant's main transmission system, have not in the past been receiving gas under the GG-6 schedule but had been the recipient of rates lower and more favorable to them although the other ninety-two cities served on the main transmission system are under the GG-6 schedule.

4. That applicant requests authority to file and to place into effect the GG-6 schedule of rates in the cities named in Finding No. 3, which schedule of rates is now on file with the Commission and is as follows:

| | | |
|---|---|---|
| First 1,000 cu. ft. per month | $1.00 | |
| Next 19,000 cu. ft. per month | .50 | per MCF |
| Next 80,000 cu. ft. per month | .40 | per MCF |
| Next 300,000 cu. ft. per month | .25 | per MCF |
| Next 600,000 cu. ft. per month | .225 | per MCF |
| Excess | .20 | per MCF |

Minimum Charge: $1 per month per meter installed.

5. Further, the applicant seeks to replace its present industrial rate schedule known as the company's schedule OCG-2 (substantially the same since 1931) by the filing and placing into effect a new interruptible contract gas rate schedule designated as ICG-1, which proposed schedule of rates is as follows:

| | | |
|---|---|---|
| First 1,000,000 cu. ft. | 25¢ | per MCF |
| Next 6,000,000 cu. ft. | 22.5¢ | per MCF |
| Excess | 20¢ | per MCF |

Minimum bill—$50.

6. The Commission, as of this date, has entered in this docket a Memorandum Opinion that comprehensively narrates the nature,

scope and substance of these proceedings and which should be incorporated in and made a part of this order by reference.

7. The applicant is in immediate need of additional revenues for the operations of its gas department.

8. The proposal contained by the addition of the cities named in Finding No. 3 to the level of the GG-6 schedule of rates now on file would not be unreasonable or unfair.

9. That the schedule of rates for industrial consumers as proposed by the promulgation of the company's proposed rate schedule, ICG-1, referred to in Finding No. 5, would be neither unfair nor unreasonable.

10. Further, that by adding the cities named in Finding No. 3 on the GG-6 rate and the filing and placing into effect of the new proposed industrial rate schedule, ICG-1, would not be discriminatory and will not be conducive to producing an excessive rate of return on the applicant's investment in its gas properties in Kansas but moreover will be in the public interest and welfare.

11. That the evidence at the hearing disclosed that the company had purchased large quantities of gas that were unaccounted for, which should not be countenanced by the Commission but on the other hand the company should be required to take immediate steps to reduce the item of unaccounted-for gas and make periodic reports to the Commission in respect thereto.

12. That there are interdepartmental transactions of gas between the gas and electric departments, the accounting practices of which are vague and indefinite from the record and the Commission should make full and complete exploration of these interdepartmental transactions.

13. That because of the circumstances encountered and referred to in Findings Nos. 11 and 12 and for other good and sufficient reasons, the Commission should take steps to initiate an investigation of the applicant as it relates to its gas utility business in Kansas under the statutory authority conferred upon it, to wit: G. S. 1949, 66-110 and 1501, *et seq.*

14. That the application herein should be granted.

It is, Therefore, by the Commission Ordered: That the application herein be and the same is hereby granted.

It is Further by the Commission Ordered: That the applicant take immediate steps to reduce the item of gas unaccounted for,

referred to in Finding No. 11, and make monthly periodic reports to the Commission in respect thereto beginning on June 1, 1952.

IT IS FURTHER BY THE COMMISSION ORDERED: That the Memorandum Opinion entered in this docket as of this date be and the same is hereby incorporated and made a part of this order by reference.

The Commission retains jurisdiction of the subject matter and the parties for the purpose of entering such further order or orders and promulgating and implementing such further rules and regulations as from time to time it may deem proper.

BY THE COMMISSION IT IS SO ORDERED.

### "APPENDIX B"

BEFORE THE STATE CORPORATION COMMISSION
OF THE STATE OF KANSAS

In the matter of the application of The Kansas Power and Light Company for consent of the Commission to make certain changes in its charges for natural gas service.—Docket No. 42,829-U.

### MEMORANDUM OPINION

The Kansas Power and Light Company, applicant in this proceeding filed an application on November 24, 1951, requesting authority (1) to file and place into effect its general domestic gas rate schedule (GG-6) in fifteen cities on its main transmission system and (2) to increase its industrial gas rates throughout its properties in Kansas except at Atchison, Leavenworth, Lansing and Emporia, Kansas.

After due notice, public hearings were held on December 19, 1951, and March 3, 4 and 5, 1952. Representatives of twelve of the fifteen cities heretofore referred to entered appearances in protest to the application placing them on the standard domestic schedule. The twelve cities were *McPherson, Great Bend, Buhler, Ellinwood, Canton, Inman, Hoisington, Lindsborg, La Crosse, Pratt, Larned* and *Kinsley.* Three cities that would be affected by granting the application as it relates to the standard domestic schedule, namely Galva, Marquette and Kingman, did not enter appearances and are not here regarded as protesting cities.

As to the portion of the application respecting the proposed increase in industrial rates, there was a group of protestants entering appearances including National Gypsum Company, the Kaw Dehydrating Company, Junction City Dehydrating Company, R. and W.

Alfalfa Mills and the cities of St. John, Macksville, Greensburg and Clay Center, along with certain of the protesting cities, which cities all purchase gas for industrial purposes, *i. e.*, municipal electric plants.

At the hearing on December 19, 1951, the protesting cities requested a continuance of the hearing for the purpose of permitting them to prepare their case as they had only a few days prior employed a rate expert and had not had adequate time to make an analysis of the application. The applicant opposed the granting of the continuance but the Commission continued the hearing until March 3, 1952.

## THREE SEPARATE GAS SYSTEMS

KP&L is a public utility engaged in business exclusively in the State of Kansas which business includes in part the transmission, distribution and sale of natural gas at both wholesale and retail. It produces no gas of its own but the sole sources of gas are from the gas fields of this state through purchase from producers and pipeline companies. By way of brief description of its gas operations in Kansas, it is essential to note that KP&L has three separate and distinct systems.

First, it distributes gas to Atchison, Leavenworth, Lansing and Emporia all in Eastern Kansas, and obtains its supply of gas wholesale from the Cities Service Gas Company. It does not transport any of the gas that it receives from Cities Service as the latter delivers to KP&L at the town borders. This system is not involved in these proceedings directly.

Second, the Company ditsributes gas in fifteen Kansas cities located along the line of the Northern Natural Gas Company from whom it purchases gas wholesale at the city gates and then distributes it to the respective cities. These cities parallel the interstate transmission line of Northern, which, as far as KP&L is concerned, extends from Englewood in a northeasterly direction to Miltonvale, Kansas. Only as it pertains to the proposed increases in industrial rates is this system directly concerned.

The third is the main transmission system of KP&L and is owned and operated by KP&L serving 107 cities retail including the twelve protesting cities here. This system is not interconnected with the other two systems or does it furnish gas to any of the cities connected to the other systems.

## AS TO DOMESTIC RATES

For over a substantial period of time all the cities on the main transmission system, excepting the protesting cities and Kingman, Galva and Marquette, have been on the GG-6 schedule which is on file with the Commission. This schedule of rates is higher than those on file for any of the twelve protesting cities and Kingman, Galva and Marquette. The schedules of rates being charged these latter cities, however, are not uniform but are lower and more favorable to them than is the GG-6 schedule.

The first part of the application is to bring the schedule of rates in the protesting cities and Kingman, Galva and Marquette, up to those of the other ninety-two cities on the main transmission system by placing them on the standard domestic rate for the system. The GG-6 rate has been on file with the Commission and in effect since 1931, and has remained unchanged except for a new designation and a provision respecting delayed payment charges.

## LOCAL GAS AND JURISDICTION

Years ago the protesting cities and Kingman, Galva and Marquette, were supplied with gas exclusively from near-by local fields. These sources of supply were obviously cheaper, more easily accessible and the transmission charges were considerably less than those under current existing conditions which are later described in this opinion. These cities, in some instances, entered into contracts with predecessor companies of the applicant which in most cases were local companies and so-called "one-city" utilities. These contracts generally called for a specified rate as long as sufficient quantities of local gas were available to supply the requirements of the respective communities. Subsequently, all of the companies supplying the fifteen cities were acquired and became absorbed in this public utility under the jurisdiction of the Commission and are now served from the main transmission line of the company.

The objections of the protesting cities to the granting of the application is grounded in part on the belief that there are adequate volumes of local gas to supply their needs but the offer of proof by any of the protesting cities is weak and there is no indication that substantial quantities of local gas are available to the applicant for transmission and distribution to the respective cities. On the contrary, the great preponderance of evidence is to the effect that the requirements of the protesting cities greatly exceed any appreciable

amount of local gas available to the applicant for retail sale in the respective protesting cities.

Some of the protesting cities posed the question of the jurisdiction of the Commission to hear the application herein because of the old contracts or possible understandings which the various protesting cities had with either the applicant or its predecessor companies relating to local gas and rates.

At the hearing we adopted the position that the jurisdiction of this Commission as it pertains to the regulation of public utilities is clear and more especially so in light of the recent pronouncement of the Supreme Court of Kansas on December 8, 1951.

That KP&L is a public utility and under the jurisdiction of this Commission cannot seriously be challenged because the statute is clear that the authority is vested with this Commission which it can neither abrogate nor delegate to the cities. It might be said too on behalf of some of the cities that when certain contracts were entered into years ago with some of the predecessor companies providing for rates dependent upon local gas the individual companies then in some instances might have fallen within the purview of the one-city utility statutory exception. To be sure, when these one-city utilities became absorbed into this integrated utility under the jurisdiction of this Commission, any exemptions granted by the statute with respect to the category of a one-city utility had to give way to the intent of the legislature respecting regulation by the state.

In addition to its duties as a public regulatory body this Commission is also the agency charged with the administration of the gas conservation statutes of Kansas. From the files of this Commission, as the gas conservation agency, it is fully conversant with the sources of supply of natural gas in Kansas. From the official records available to the public, it is evident that the local supply of gas to the near-by protesting cities is insufficient for their requirements as the fields adjacent to these cities are old, for the most part, and now are either virtually exhausted or rapidly nearing the stage of depletion. To point out two illustrations relating to two of the large protesting cities, namely Pratt and McPherson, the closest local supply of natural gas to Pratt is the Cunningham Gas Field which is located in parts of Kingman and Pratt Counties. Prior to February 27, 1952, the Commission had been studying the Cunningham Gas Field for more than two years, especially as it related to the field's rapid state of depletion and finally by an order on February 27, 1952, after

a public hearing, we took the field out from under proration in order that the field might yield the fullest amount of gas in its dying days. It will not be long before this field will be a memory.

McPherson County some twenty years ago was an important source of supply of natural gas and was a great producing gas county for that era. The records of this Commission disclose that during 1951, there were only two gas wells in the entire county which were delivering gas in pipelines at 16.4 pounds pressure and the evidence does not reflect that there is any possible increase in number of wells to be connected with pipelines at the present time although there is minor scattered gas production, some of which is being sold locally, principally to one refinery. In addition to the city of McPherson, there are six other cities in the county where the applicant has distribution systems. The local fields in Mc-Pherson County cannot be said, and unfortunately so, to be capable of producing sufficient volumes of gas to meet the requirements of the seven cities in McPherson County.

As a passing commentary, the only principal and all-important source of supply of gas now in Kansas, with many years of life remaining, is the Hugoton Gas Field in southwestern Kansas. In this connection, the records of this Commission further indicate that outside of the Hugoton Field all the other gas fields in the state taken as a whole declined in delivery to pipelines from 1950 to 1951, and the trend can only continue in a downward course until and unless there are new discoveries of large gas fields in Kansas.

To permit the protesting cities here to remain on a more favorable schedule of rates than their sister cities located on the same transmission system can be construed only as discrimination in favor of the protesting cities. There is no justification with the rapidly diminishing local production and the higher costs for gas plus increasing transmission expenses for permitting the protesting cities to remain in a more advantageous position than other towns so similarly situated. They should be on the standard domestic schedule of rates for the system.

## ACUTE SUPPLY SHORTAGES

For many years, especially before 1948, KP&L has had an extremely serious problem in its inability to obtain adequate and available supplies of gas on a firm basis to meet its requirements. In a measure, this condition has been improved for at least the time being but it remains an enigma which the company management

has not yet solved. There were two simple reasons for applicant's acute shortage of gas.

The first is the unprecedented increase in demand for gas for domestic purposes because of new construction and the ever increasing domestic conversions to gas from other fuels and the continuing mounting demands from industry for this precious commodity which is substantially cheaper and more efficient than other fuels.

The second reason and by far the most important has been occasioned by the rapid depletion and exhaustion of sources of supply that have been available to KP&L prior to 1948, and the lack of any new substantial sources through either the development of new gas fields or purchase from willing sellers except one which will be referred to later.

As heretofore remarked, Cities Service furnishes gas for the company distribution systems at Atchison, Leavenworth, Lansing and Emporia, and Northern supplies gas at the city gates to fifteen other cities not connected to the main transmission system.

The record in this proceeding is replete with evidence of the foregoing facts which can be substantiated readily by the records of this Commission.

## RELIEF BY TEMPORARY CONNECTION

By 1948, the company management fully aware of the impending crisis in the shortage of gas for its main transmission system was able to enter into a temporary contract with Cities Service for the following heating season and was able to buy small amounts of gas from other pipeline companies. The reason that the Cities Service was able to literally come to the rescue of KP&L for its main transmission system at that time was because of the fact that it had under construction a new pipeline across the state from the Hugoton Gas Field into the Kansas City area. By the 1948-49 heating season, this line was completed only as far as Hutchinson, from where it was able to divert large volumes of gas for that particular heating season to the applicant. If that source of gas had not been available then, it is unquestioned but that there would have been hardships and extreme suffering besides economic losses to the public relying upon gas from the applicant's main transmission system.

By way of comparison, for instance, the applicant's principal source of gas prior to 1948, was from fields in Barber County, from which deliveries of gas to the applicant declined over fifty percent from 1947 to 1949. Deliveries from the fields in McPherson County

in the same period of time dropped approximately one-third. In face of the continual demand for more gas throughout the territory before 1949, the applicant's reserves were rapidly diminishing.

## HUGOTON PRODUCTION COMPANY'S CONTRACT

On October 18, 1948, KP&L entered into a long-time contract with the Hugoton Production Company, a newly-formed corporation owning some 95,000 proven acres in the Hugoton Gas Field, which acreage was dedicated exclusively to KP&L. Obviously, Hugoton Production, although it had substantial acreage, but with little development, could not in any degree start to fill KP&L's requirements. To further complicate the situation, one of the conditions of the Hugoton Production contract was that the point of delivery of its gas was to be in the Hugoton Gas Field necessitating KP&L seeking authority from this Commission to construct a 145-mile steel pipeline from Grant County in the Hugoton Field to a location in Pratt County so as to connect with the applicant's main transmission system. This necessitated substantial financing and obviously the time of construction was over a long period of months.

After the creation of Hugoton Production, it soon became involved in litigation commenced by the Federal Power Commission in which this Commission was an active litigant on the side of Hugoton Production. This litigation eventually reached the Supreme Court of the United States where the matter was ultimately adjudicated by that tribunal. Not until, however, the final adjudication of the controversy could there be any positive assurances that Hugoton Production could fulfill its contract with KP&L although all of its gas was to be produced from a Kansas field by a Kansas company delivering its entire production to a Kansas utility for transmission, distribution and sale exclusively to Kansas citizens.

Another factor in connection with the Hugoton Production contract is that at the time it was entered into it was common knowledge that KP&L was required to pay the highest field price then known in the state. The contract further includes an escalator clause which will be up for renegotiation for the first time next year.

Hugoton Production, under the terms of its contract, began supplying gas to KP&L but it was readily discernible that it could not fulfill the demands of the public for gas on the applicant's main transmission system, if at all, for a number of years. Since 1949, and up to the present time, Hugoton Production has had an exten-

sive drilling program and has added new wells to the line practically every month since it started making deliveries to the applicant.

Although Hugoton Production was and is supplying large volumes of gas to the applicant, on April 12, 1951, it filed an application with the Commission in which it requested an exception to the provisions of paragraph "p" of the Basic Proration Order for the Hugoton Gas Field and for temporary relief against the shut-in provisions of said paragraph. Following the filing of the application, the Commission conducted a public hearing on the application on April 27, 1951, at Wichita, and three days later entered its order in this docket granting the application to Hugoton Production. The Commission found in its order, *inter alia*, that forty-nine of the sixty wells furnishing gas to KP&L had been shut in for overproduction pursuant to the provisions of said paragraph "p" and that KP&L was experiencing acute shortages for its requirements and that if the application was not granted, distressed conditions and undue hardships would prevail and substantial economic losses would be incurred by the public all along KP&L's main transmission system. There was testimony to the effect that possibly before September, 1951, all industrial users of gas on the system, including schools, churches and hospitals, would be cut off completely and further, it was highly questionable whether there would be any appreciable amount of gas for domestic users throughout the heating season of 1951-1952.

We will not elaborate here on the evidence in connection with the possibility of an acute shortage which would have existed to both domestic and industrial users of gas on KP&L's main transmission system only to say that if that application had not been granted it is apparent that all users of gas on the main transmission system of KP&L would have had drastic shortages of gas and in many instances there would have been no available supply whatsoever. It is pointed out here that Hugoton Production is still legally overproducing its wells and adding new wells monthly in an effort to meet the requirements of KP&L, which condition, as it pertains to the legal overproduction, may continue throughout this year and into 1953.

Under the rules relating to the Basic Proration Order for the Hugoton Field, Hugoton Production, in order not to violate the spirit and intent of the law and the proration order, will be required

to make up every foot of gas that it has legally overproduced and bring its wells into balance.

The foregoing has been related by us because we feel that it is only fair that we look at the matter objectively and record a clear picture of some of the events that have transpired in the procurement of gas supplies for the domestic, commercial and industrial users on KP&L's main transmission system.

## PROPOSED INDUSTRIAL RATES

The schedule of industrial rates (OCG-2) now in effect was first established in 1931 and was slightly modified in 1944. The proposed new rate is designated as the applicant's Interruptible Contract Gas Rate Schedule (ICG-1) with which the company proposes to supersede the OCG-2 rate.

Prior to the filing of the application the company alleged that it had written commitments from more than seventy-five percent of its industrial users through voluntarily executed agreements accepting the newly proposed industrial rates in Schedule ICG-1. The record discloses that the industrial users not executing agreements for the new proposed industrial rate did not, on the other hand, appear as protestants in these proceedings excepting those that are noted on page two.

The prime factors that evidently brought about this application are the increased costs of gas and the attendant increasing transmission expenses that are clearly demonstrated by the requirements of this company in building the new 145-mile pipeline to the Hugoton Field which has heretofore been referred to. We observe that the bottom step in the OCG-2 rate is extremely low and within close range of the Hugoton Field price which applicant is required to pay for its main source of gas. We are fearful that the schedule of industrial rates (OCG-2) is now outmoded and was designed for the day when the price of gas at the wellhead was considerably less than it is now. The original filing date of the present industrial rates of over twenty years ago gives rise to serious doubt whether the rates in certain steps of that schedule even return to the applicant today's purchase price and transmission costs of the gas.

We are further concerned that the OCG-2 schedule is not a fair and reasonable rate and places a burden on domestic consumers. Especially is this true if the delivered rates to industrial consumers are at a loss or at near cost. Then too we are fully aware that even

with the new industrial rates proposed by the applicant the price of gas delivered to the industrial customers is not remotely competitive with either coal or oil. There is no evidence in the record that the proposed new industrial rates are not fair and reasonable or is there convincing evidence that would indicate that the increased revenues to be realized by applicant from the new industrial rates would be conducive to producing an unreasonable return to the applicant for the use of its gas facilities.

The applicant alleges and its evidence (which is not disputed) discloses that the vast number of its industrial consumers have not taken issue as to the proposed promulgation of the new industrial rates. We always must be alert that industry pay its fair and proportionate share of the cost of industrial gas so that it will not be to the detriment and burden of the domestic consumers.

We realize that industrial users desire to purchase this valuable commodity as cheaply as is possible but in this particular instance there is no evidence to warrant us in arriving at any conclusion other than that the new proposed industrial rates are fair and reasonable and the applicant should be permitted to file them and place them into effect.

## NEED FOR ADDITIONAL REVENUES

An objective sought to be achieved by the applicant through the granting of the application now before the Commission, according to an allegation therein, is "to provide additional needed revenue." An examination of all the exhibits touching on the need for additional revenues proffered at the hearing show a thorough analysis pointing to a deduction that the company must obtain additional revenues from its gas operations. The protestants here have not substantially challenged the testimony of the applicant relative to this point.

While an audit has not been made by this Commission of the company's books, accounts and records, the financial data that has been submitted up to this time, discloses that the company is entitled to some additional revenues from the operations of its gas department. We are not here determining any rate base for the gas properties of the applicant, nor are we here concurring in the reflections of the financial data that has been submitted, but until such time when a study may be made of the functions of the gas department this allegation cannot be successfully refuted for several reasons, including increasing costs of purchased gas, wage increases,

higher maintenance charges, and other items that go to make up the expenses of an operating company, to say nothing of the increased taxes which are a reality to the company now.

For the time being, the company has made an adequate showing of its current need for additional revenues from the operations of its gas transmission and distribution properties. We presently believe that the most effective way to permit KP&L to increase its revenues is by the proposals contained in its application. No other alternative has been submitted to the Commission for the company to obtain additional revenues from its gas properties.

We will not add further to this memorandum opinion in the nature of a condensation of the applicant's requirements for additional revenues, because the record contains an abundance of evidence in support of the applicant's contention in this respect.

## INTERDEPARTMENTAL TRANSACTIONS

One of the complexities that confronts us here is the method employed by applicant in treating its interdepartmental sales and interdepartmental exchanges of gas between its electric and gas departments. The manner of determining costs of gas in these transactions between the departments of the applicant is so involved and the record on the subject is so confused and incomplete that we can not resolve the propriety of the proper charges that should either be made to the electric department or credited to the gas department.

The problem is further complicated by a question as to whether some of the gas purchased from Hugoton Production by the applicant ever finds its way into the proper accounts of the company. There is a veiled possibility that through some degree the gas department of the applicant, as it relates to the main transmission system, may be subsidizing a segment of its electric properties by a charge to the electric department of an understated cost for the purchase and transmission of the gas from the Hugoton Gas Field to the electric properties.

From the record that is before us we cannot determine this particular question at this time but it is sufficient to say here that there should be a full exploration of the costs and accounting methods in the gas transactions between the two separate departments of the applicant. The question of interdepartmental sales or interdepartmental exchanges of gas between the gas department and the electric department is of such importance that it will be fully ex-

plored and studied in the investigation of KP&L which is being instituted this date by an appropriate order because it is only through such an investigation that a full and comprehensive analysis of this problem may be made by us. The public interest warrants, and the company should concur therein, that a full disclosure be made relating to this phase of the company's gas business.

## UNACCOUNTED-FOR GAS

Another of the questionable factors in these proceedings is the acknowledgment by applicant of the high percentage of gas purchased which is unaccounted for. The applicant classifies this undeterminable as unaccounted-for gas, which definition and terminology certainly includes line losses that may only be expressed as waste. The applicant's exhibits and testimony reflect that there are substantial volumes of unaccounted-for gas and for which the explanations as to the accountability are indefinite and vague. Whether this is line loss or so-called "free gas" or is diverted to other sources is not clarified by the record and we are considerably disturbed that substantial volumes of this precious fuel are unaccounted for in the company's books, accounts and records. It appears that the unaccounted-for gas of applicant may have run as high as 12.79 percent in 1950, and instead of decreasing in recent years the volumes and percentages may have increased.

An exhibit offered by the protesting cities relating to unaccounted-for gas is not helpful to us. It is simply a tabulation of other gas utilities in the state which in themselves cannot be compared with KP&L because in many instances the other companies are not transporting companies. It is not logical to compare a utility that purchases gas at a city gate with another that transports and delivers gas from Grant County, Kansas, in the southwestern part of the state as far north in Kansas as Mahaska on the Nebraska line and as far east as Seneca and Silver Lake in northeastern Kansas. KP&L transports and distributes gas in more than thirty Kansas counties whereas some of the companies which protestants seek to compare it with, in some instances, serve only small and isolated communities.

Further, the protesting cities' exhibit is of little value to us because it fails to adopt a uniform basis for comparisons of unaccounted-for gas as it relates to pressures and temperatures. Without such a uniform basis any analysis by way of comparison is not pertinent.

We cannot reach a conclusion as to the reasons for the unac-

countability of large volumes of gas by the applicant which could conceivably affect not only the protesting cities and industrial protestants but all ninety-two cities now on the standard domestic rate and all industrial users on the system.

Likewise, if there are large volumes of gas that cannot be accounted for it most certainly adversely affects the company and because of the seriousness of the situation not only to the applicant and to its consumers, but to the possibility of waste which is prohibited by the statute, we are today by appropriate order taking measures for an investigation of the applicant under the statutory authority vested with this Commission, which investigation, *inter alia*, will include the study and analysis of the unaccounted-for gas of this utility. In the meantime, however, by appropriate order entered this date, the company will be required to take immediate steps to reduce the volumes of unaccounted-for gas and to make periodic reports to the Commission until further order of the Commission as to the progress made in reducing the amounts of unaccounted-for gas.

There is some evidence that the company is making an effort to decrease the item of unaccounted-for gas, but we are not content to refrain from pursuing the various ramifications which have led the company to not account for the ultimate disposition of large quantities of gas.

We are not here passing on the question of the reasonableness or unreasonableness of the unaccounted-for gas because the record before us is inconclusive, incomplete and so fragmentary in respect thereto that it will require extensive study and analysis to reach an ultimate determination on the subject.

## CONCLUSION

We have not presumed here to review in detail in this opinion the voluminous record that was made in these proceedings which includes 426 pages of testimony and forty-nine exhibits. Throughout the proceedings there was much repetition and some evidence offered that was extrinsic and not germane to the issues before us. We do desire to say, however, that the evidence is clear that the applicant has made and contemplates substantial capital improvements in its gas properties; that it has been required to obtain large amounts of financing to carry out its construction program, including the further development of its gas properties and it is rendering reasonably sufficient and efficient service. The applicant has en-

countered in recent years as one of its marked increases in cost, the ever increasing purchase price of gas; it has experienced increased wage adjustments and has had to assume added responsibilities through the construction, operation and maintenance of the 145-mile pipeline previously referred to.

There are certain points in these proceedings relating to the interdepartmental transactions and the unaccounted-for gas, which we have discussed, that we are not satisfied with. We have concluded to institute an investigation as of this date which will not only relate to the questions of interdepartmental transactions and unaccounted-for gas but will also explore the company's rates, charges, classifications, conditions of service, costs, expenses and other matters which may be deemed necessary in order that the Commission may fulfill and accomplish the duties imposed upon it by the legislature.

We conclude that the applicant should be permitted to file and to place into effect its general schedule of rates denominated as GG-6 as it pertains to the fifteen cities which we deem to be fair and reasonable and will avoid discrimination.

Further, we come to the conclusion that the applicant should be permitted to file and place into effect its proposed Interruptible Gas Rate Schedule (ICG-1), which rates cannot be regarded as being unfair and unreasonable.

The increase in revenue from the granting of the foregoing herein will not be conducive to producing an excessive rate of return on applicant's investment in its gas properties in Kansas and will not result in discrimination between the various classes of consumers but on the other hand will be in the public interest and welfare.

Appropriate orders in conformance with the views heretofore expressed will be entered this date in this docket and in Docket No. 43,579-U and this memorandum opinion is hereby incorporated and made a part of said orders.

## "APPENDIX C"

The Court: I suppose, gentlemen, that for the protection of my own record possibly I should give this matter further thought and take considerable more time to determine it. But it seems to me like this is a case of considerable importance to all of the parties and that this court is probably only an intermediate court anyhow, and that the situation is such that this court should make a decision as early as possible. I shall endeavor to do so.

Now the first question, as I see it, as raised here is the section

of the statute under which the parties, or the commission proceeded —whether it was under section 66-110 or section 66-117? I am inclined to think that the Commission itself proceeded under section 66-110 irrespective of the attitude and intention of the Kansas Power and Light Company at the time of filing the application.

Now it seems to me that section 66-117 would be a proper section of the statute to determine the issue upon the illustration that Mr. Kyle made, or gave, this morning upon the establishment of a tariff for the shipment of a barrel of linseed oil from Pratt to Kingman. Clearly on that situation the Commission could proceed under 117 as to providing an equitable rate or tariff, and that the question of the rates proper or of the investment would not enter into it. While in the instant case it seems to me that this is definitely a rate case and the Commission has so considered it.

I think that if the number of cities here were just reversed there could be no question but what this was fairly and reasonably a rate case. As the situation stands now fifteen cities are directly affected by the raise in rates, but had the numbers been just reversed and the ninety-two cities were being raised to the rate that the fifteen cities had been paying, then I think there wouldn't be any argument probably that this was a rate case. At least that is the way I view it, and I am not an expert at all on rate cases. But that is the way it appeals to me, that the Commission did fix the rate for fifteen cities of the state and I don't know of any reason why they should not have given the same consideration to the fixing of rates for those fifteen cities that they would give for fixing the rate in the 107 cities that were involved in their system. So I am inclined to think that the Commission proceeded under section 66-110 and that this court should so treat the proceeding.

Now the next question which comes up is whether or not this court has a right to determine this matter upon the motion. I am inclined to think it has. I know of no reason why I should look over four, five or six hundred pages of record here to determine what the facts are in the case when I may look at the order and findings of the Commission and determine a sufficient number of facts upon which to make a decision. I treat all of the findings that the Commission made as true. So why should I read the record to find out what all the facts are? I think the Commission has made ample findings there for me to determine what I think is the law.

Accordingly, I think that I should proceed to determine the matter upon the motion. There has been some argument upon

discrimination. I don't think there is any question but what there were some discriminatory rates here. I know of no particular reason why these fifteen cities should not pay the same rate that the other ninety-two cities are paying. But probably the Commission was correct in its decision to eliminate some discrimination. But that doesn't, in my mind, give them the right to fix the rate, the ultimate rate which these cities should pay, the fifteen cities and the ninety-two cities, one with the other, whether the rates should have been increased to equal the ninety-two cities or whether the ninety-two cities should have been reduced to the fifteen cities. Certainly the Commission had to act upon some theory in raising the rates.

Now were they sufficiently informed to do that under the findings that they have made here? I am of the opinion now that the Commission's order of April 30th was at least improvidently and prematurely issued. As I view the situation the Corporation Commission has a grave responsibility and a very serious obligation in determining the respective rights under the application now under consideration. On the one hand there is the 107 Kansas cities, and I don't know how many, but quite a number, industrial plants responsible to hundreds of thousands of people who are entirely dependent upon the Corporation Commission for a determination of a fair and reasonable gas rate.

And on the other hand there is the Kansas Power and Light Company with hundreds, or perhaps thousands, of stockholders entirely dependent upon the Corporation Commission for a reasonable rate of return upon their investment. So it seems to me that with so much and so many involved the change in rates as has been made here should be made only with reasonable certainty as to the justification for a change.

As I see it, about all the Commission has done here has been an attempt to equalize by raising the rates of the fifteen cities affected and making them equal with the rates now and heretofore in effect in the other ninety-two cities. But what is a fair and reasonable rate in this case? I think that was what the Commission was bound to determine. Is it the rate being paid previously by the fifteen cities, or is it the rate being paid by the ninety-two cities? Or is it some rate in between these two? What is the fair and reasonable rate?

It seems to me like that was the proposition that was before the Commission and which they did not basically determine in this hearing.

It is true that the Commission in its findings Nos. 7, 8, 9 and 10 I think it is, made some general findings which tended to support its order. But it has also made some specific findings upon which, or in disregard of which, the general findings are made. And it is my opinion that the specific findings upon any particular proposition are entitled to greater weight and credit than a general finding upon the same subject.

In the memorandum opinion they clearly state that they have not determined any rate base in this case and that they haven't concurred in the Power Company's figures as to what the rates should be. So I don't know how the Commission could know whether to raise the rates in the fifteen cities or to lower them for the ninety-two cities. I think it should have first determined what the rate base would be; what would or would not give to the Kansas Power and Light Company an adequate and fair return.

In findings Nos. 11 and 12 the Commission finds that there are large quantities of unaccounted for gas and that there are interdepartmental transactions of gas between the gas and electric departments of the company which may or may not have a great bearing upon the gas rate to be fixed for the applicant cities.

And then in finding No. 13 the Commission finds that it should immediately initiate an investigation of the company to determine with reference to the unaccounted for gas and these interdepartmental transactions. I fully agree with the Commission upon that. I think they should be apprised of those matters. And then further in their memorandum opinion some place they say that these interdepartmental transactions are so confused and incomplete that they cannot resolve the propriety of the proper charges.

Well, it is inconceivable to me that they should attempt to do so in the face of that statement.

Now it was said in the argument here, or in the application, that the rates applied for, the increased rates applied for equal some $658,000. And it is also said here that the unaccounted for gas at the prevailing rate would equal somewhere in the neighborhood of $600,000. It is conceivable to me, it might be stretching the imagination some, but it is not an impossibility that the amount of additional revenue sought by the Power and Light Company here might be supplied through some Commission orders relative to these two items.

So I think that they should have made a determination there.

Altogether, just in the way of summation, it seems to me that the Commission might have got the cart before the horse in this matter and that in making their order on April 30 the Commission in ordering this investigation of unaccounted for gas and interdepartmental transactions should have completed that, at least, before ordering the increase in gas rates for these fifteen cities.

And I can't get away from the fact, with what little knowledge I have of rate making, that they should also have determined the valuations, investment, in order to know what would be the fair and reasonable rate as between the company and its consumers.

So, gentlemen, in concluding it seems to me like the Commission having raised these rates without establishing a rate base and without first investigating the unaccounted for gas and the interdepartmental transactions that the Commission's order of April 30 *is* unlawful and unreasonable. And as a conclusion of law I am of the opinion that the Commission's order should be reversed and the entire matter should be certified back to the Commission to proceed in accordance with the light of these findings and their own rules of procedure. And that will be the order, gentlemen.