COLORADO INTERSTATE GAS COMPANY, *Appellee,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, SOUTHWEST KANSAS ROYALTY OWNERS ASSOCIATION, and PANHANDLE EASTERN PIPE LINE COMPANY, *Appellants, Cross-Appellants,* and *Cross-Appellees.*

No. 41,516

NORTHERN NATURAL GAS COMPANY, a corporation, *Appellee,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, SOUTH-WEST KANSAS ROYALTY OWNERS ASSOCIATION, and PANHANDLE EASTERN PIPE LINE COMPANY, *Appellants, Cross-Appellants,* and *Cross-Appellees.*

No. 41,555

COLORADO INTERSTATE GAS COMPANY, *Appellee,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, SOUTHWEST KANSAS ROYALTY OWNERS ASSOCIATION, and PANHANDLE EASTERN PIPE LINE COMPANY, *Appellants, Cross-Appellants,* and *Cross-Appellees.*

No. 41,556

NORTHERN NATURAL GAS COMPANY, a corporation, *Appellee,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, SOUTH-WEST KANSAS ROYALTY OWNERS ASSOCIATION, and PANHANDLE EASTERN PIPE LINE COMPANY, *Appellants, Cross-Appellants,* and *Cross-Appellees.*

(386 P. 2d 266)

Opinion filed November 2, 1963.

*Robert C. Londerholm,* of Topeka, argued the cause, and *J. Robert Wilson, John D. Townsend, Charles C. McCarter, J. B. Grant,* and *Charles R. Escola,* all of Topeka, and *Richard C. Byrd,* of Ottawa, were with him on the briefs for the appellant, The State Corporation Commission of the State of Kansas.

*Dale M. Stucky,* of Wichita, argued the cause, and *A. E. Kramer* and *Bernard Nordling,* both of Hugoton, *Wayne E. Coulson, Paul R. Kitch, Donald R. Newkirk, Robert J. Hill, Gerrit H. Wormhoudt, Philip Kassebaum, John E. Rees, Robert T. Cornwell, Willard B. Thompson, David W. Buxton, Homer V. Gooing,* and *Hugo T. Wedell,* all of Wichita, were with him on the briefs for the appellant, Southwest Kansas Royalty Owners Association.

*Jeff A. Robertson,* of Topeka, argued the cause, and *Wendell J. Doggett* and *C. A. Conoley,* both of Kansas City, Missouri, and *Chas. Vance* and *C. C. Linley,* both of Liberal, were with him on the briefs for the appellant, Panhandle Eastern Pipe Line Company.

*Malcolm Miller,* of Wichita, argued the cause, and *L. M. Poe,* Colorado Springs, Colorado, *Ray H. Calihan* and *Daniel R. Hopkins,* both of Garden City, and *Carl T. Smith, Stuart R. Carter,* and *Gerald Sawatzky,* all of Wichita, were with him on the briefs for the appellee, Colorado Interstate Gas Company.

*Mark H. Adams, II,* of Wichita, argued the cause and *Lawrence I. Shaw, F. Vinson Roach,* and *Patrick J. McCarthy,* all of Omaha, Nebraska, *Ray H. Calihan, Logan N. Green, Daniel R. Hopkins,* and *Ray H. Calihan, Jr.,* all of Garden City, *Mark H. Adams, Charles E. Jones, William I. Robinson, J. Ashford Manka, Clifford L. Malone, John S. Seeber, Floyd E. Jensen,* and *Joe Rolston,* all of Wichita, were with him on the briefs for the appellee, Northern Natural Gas Company, a corporation.

The opinion of the court was delivered by

HATCHER, C.: These appeals are from judgments of the district court on the review of numerous orders of the State Corporation Commission establishing allowables for the Kansas-Hugoton Natural Gas Field. The review proceedings challenged the validity of monthly allowable orders and related orders pertaining to the gas field. The many appeals filed (thirty-nine) as Cases 41,515 and 41,516 are from identical judgments rendered in separate actions which were tried together on a single record and involve the orders from May, 1956, through September, 1958. Cases 41,555 and 41,556 are appeals (thirty) from similar judgments involving the Commission's six-months allowable order for the period from October, 1958, through March, 1959, and the monthly allowable order for October, 1958, through January, 1959.

The lower court "reversed and set aside" all of the orders in part. Appeals were then taken to this court.

Before the above mentioned cases reached this court for determination, additional appeals had been filed challenging judgments of district courts in two separate forums which had reviewed the same orders of the Commission fixing the six-months allowables for the period covering October 1, 1959, through March 31, 1960,

and also the monthly allowable orders covering each month for the same period. Although these appeals will be disposed of in a separate opinion, they are mentioned here because the general facts are applicable to all.

It will be noted that the various parties filed separate appeals, separate abstracts, and separate briefs. Fifty-two separate printed documents consisting of abstracts and briefs have been presented to this court, all covering substantially the same facts and questions of law.

The district court, which disapproved the orders of the Commission, refused to make findings of fact and conclusions of law. In an attempt to have the issues pinpointed, and to develop some semblance of order from the voluminous and chaotic record, this court appointed Mr. Harry Colmery, a member of the Bar of this state, to make findings of fact and conclusions of law on what he thought to be the issues involved in the numerous appeals and report thereon. The Commissioner has done so in a most efficient and commendable manner. Although the Commissioner's findings and conclusions can be advisory only, they have served the very useful purpose of forcing the parties to limit their controversy to clear-cut issues. The findings and conclusions of the Commissioner are challenged in some respects. Some errors occurred because of ambiguities and confusion in the record. The report of the Commissioner has resulted in clarification of such matters through supplemental briefs.

The Hugoton Gas Field was discovered near Hugoton, Kansas, in 1922, but it was not until about 1929 that its possibilities for domestic and industrial purposes had been fully realized. It is said to be the largest known reservoir of natural gas in the world, the gas being found at a depth of about 2,600 to 2,900 feet in porous limestone and dolomite formations about 50 feet thick. The thickness of the gas producing horizons varies considerably. Such horizons are not uniform as to their porosity or permeability. The field, as presently developed, is approximately 160 miles long and varies from 40 to 72 miles in width. It covers portions of the nine counties in the southwest corner of Kansas, extends across the entire width of the Oklahoma Panhandle, and into portions of several counties of northern Texas. The largest portion, about two-thirds, of the field is located in Kansas. This portion is commonly

known as "Kansas-Hugoton." The portion in Oklahoma is called "Guymon-Hugoton" and that part in Texas "Texas-Hugoton."

The sole purchasers of gas produced in the Kansas Hugoton Field, as stated by the Commission, are Cities Service Gas Company, Colorado Interstate Gas Company, Hugoton Production Company, Kansas-Colorado Utilities, Inc., Kansas-Nebraska Natural Gas Company, Inc., Northern Natural Gas Company, Panhandle Eastern Pipeline Company, Quinque Oil and Gas Producing Company, United Carbon Company, and Shallow Water Refining Company.

When the basic order for the field was promulgated in April, 1944, there were only 331 Kansas wells. When these proceedings were initiated in 1956 there were 3,555 Kansas wells producing from 2,262,748 acres. There are relatively few remaining undrilled locations.

Most of the gas from the Kansas-Hugoton Field is transported through large pipelines to points far removed from Kansas. A small portion is consumed in the Wichita, Topeka, and Kansas City areas. The rest is transported and consumed in Michigan, Minnesota, Ohio, Illinois, Indiana, Missouri, Colorado, and Nebraska. With one or two exceptions the gas produced from the Oklahoma and Texas portions of the field is similarly transported through the same large pipeline systems for the same or similar uses.

The integrated pipeline sytems which transport gas from the Kansas-Hugoton Field are also connected with other gas fields. Kansas gas is therein commingled with gas from various other fields, including the Guymon-Hugoton.

In 1956, five major pipelines, Cities Service Gas Company (Cities Service), Northern Natural Gas Company (Northern Natural), Panhandle Eastern Pipe Line Company (Panhandle), Kansas-Nebraska Natural Gas Company (Kansas-Nebraska), and Colorado Interstate Gas Company (Colorado Interstate), had acquired the exclusive right to purchase the gas produced from 90% of the Kansas-Hugoton wells. (These five pipeline companies, which are involved in this controversy, will hereinafter be identified as indicated in the parentheses.) Two companies, Cities Service and Northern Natural, controlled through purchase contracts approximately 56% of the field's deliverability.

Except for a very limited phase of Panhandle and Kansas-Nebraska's operations, these pipelines are not producers. They do not own the land, leases, or wells from which the gas is produced.

In 1935, the Kansas Legislature enacted a statute entitled "Production and Conservation of Natural Gas" (Laws of 1935, Ch. 213), which now appears, with some amendments, as G. S. 1949, 55-701, *et seq.*

G. S. 1949, 55-701, provides:

"That the production of natural gas in the state of Kansas in such manner and under such conditions and for such purposes as to constitute waste, is hereby prohibited."

It will be noted that the first and main emphasis is placed on the prohibition against waste. The term waste is defined by G. S. 1949, 55-702.

G. S. 1949, 55-703, provides the conditions under which the Commission shall take jurisdiction over production in a gas field by the following language:

"That whenever the available production of natural gas from any common source of supply is in excess of the market demands for such gas from such common source of supply, or whenever the market demands for natural gas from any common source of supply can be fulfilled only by the production of natural gas therefrom under conditions constituting waste as herein defined, or whenever the commission finds and determines that the orderly development of, and production of natural gas from, any common source of supply requires the exercise of its jurisdiction. . . ."

The section further provides for ratable taking:

". . . The commission shall so regulate the taking of natural gas from any and all such common sources of supply within this state as to prevent the inequitable or unfair taking from such common source of supply by any person, firm or corporation and to prevent unreasonable discrimination in favor of or against any producer in any such common source of supply. . . ."

On the 21st day of March, 1944, the Commission promulgated what it designated "Basic Proration Order for the Hugoton Gas Field." In this order the Commission first reviewed the history, development, and production in the field. It then stated that it was necessary for the Commission to take jurisdiction and to prescribe rules for the production of gas from the wells in the field and such other wells as may be later completed. The acreage for well spacing was fixed at 640. Pressure, open-flow, porosity, and thickness of pay, which determined deliverability against the pipeline pressure, was also to be taken into consideration in determining the wells' allowable. The order further provided:

"At such time and place as the Commission shall fix, the Commission will, after notice, conduct a hearing to determine the market demand for natural gas from said field for the next six succeeding proration periods, or for such

other period of time as the Commission shall prescribe, and at said hearing may determine any other questions which may properly and legally come before the Commission for consideration thereat, and a new schedule of production allowable for the wells in said field, based upon the determination made as a result of such hearing, shall be prepared and promulgated for the ensuing proration periods."

Paragraph *p* of the order provided in part:

". . . If, at the end of any proration period, there is an overage or underage in production for any well during such period, same shall be carried forward as a charge against or credit in favor of such well and subtracted from or added to, as the case may be, the allowable for such well for the next proration period. Any overage in production from any well during any proration period which is not equalized by ratable overages from all other wells in the field or which is not compensated for in the allowables fixed for other wells in the field for the next succeeding proration period or not otherwise made up within one year after the proration period in which it occurred, shall constitute illegal overproduction from such well and such well shall be shut in until such overage is thereby fully made up. All wells with an overproduction of three times the amount of their current month's allowable shall be shut in by the operator or producer and not permitted to produce any gas until such overproduction has been fully absorbed by deductions from such overproduction made by current allowables. When any connected well has accumulated an underage in excess of three times its allowable for the current month, such excess shall thereupon be canceled and the amount so canceled shall be spread among all the wells of the field. Any underage so canceled shall not be considered in the determining of the future production of any such well, unless, upon notice and hearing, the Commission shall otherwise determine: *Provided, however*, That in no event shall any underproduction of an unconnected well be canceled."

The order further provided:

"That this order should constitute the Basic Order for the proration of production in said field on or after March 31, 1944, and until amended, changed, or modified by further order of the Commission.

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"IT IS FURTHER ORDERED: That the Commission hereby retains continuing jurisdiction of the subject matter hereof and of the parties hereto for the purpose of issuing from time to time such further order, amendments, additional orders, rules and regulations as may be necessary and proper in the premises."

Under the basic order each well was allowed to produce a certain quantity of natural gas per month. This was called the well's "allowable." From the beginning of proration in the Kansas-Hugoton Field until May, 1956, the allowables were set twice a year (March and September). The Commission held market demand hearings where the pipelines presented their estimated takes (nomi-

nations) for the following six-month period. Each month the total nominations were taken to be the market demand for the field for that month. The market demand figure was adjusted by subtracting the field underage (allowables in excess of runs) for the prior month or by adding the field overage (runs in excess of allowables) for the prior month, whichever had happened. This adjusted figure (called current allowable) was spread ratably to the wells in the field.

The "net allowable" is not the figure that is spread to the wells. Only the current allowable is spread ratably among the wells in the field. Net allowable reflects the cumulative status of a well or wells. Some wells would be in an overproduced status and some would be in an underproduced status at the end of the prior month's runs. If a well were 500 MCF underproduced and its share of the field current allowable was 500 MCF, then its "net allowable" at the beginning of the month would be 1,000 MCF. The field net allowable reflected the cumulative status of the field at the beginning of the period for which the allowables were determined.

This method of calculating the allowables not only tended to hold the allowables to the requirements of the pipeline companies taking the least amount of gas from the field in proportion to which its connected reserves bore to the field as a whole, but prevented increased takes of gas by one company when it acquired new consumer markets unless the other pipelines also wanted to take more gas. If one pipeline company nominated to receive more gas, the extra allowable would be spread among all the wells in the field. If the other pipeline companies continued taking at the old rate, an underage would be created. The following month this underage would be deducted from the market demand to find the current allowable so they would be back where they started. Obviously one pipeline company could not effect any material change in the allowables unless the other pipeline companies went along with it. The pipeline companies did not expand at the same time, when one wanted more gas, the rest could exercise veto power.

It finally became apparent to the Commission that its method of fixing allowables was preventing the individual pipeline companies from obtaining their market demands, that the allowables which it was fixing had no relation to the actual market demand in the field, and that the field was being detrimentally affected by the allowables.

When the Commission issued its order for the regular market demand hearing on March 30, 1956, to determine the allowables for the period April 1, 1956, through September 30, 1956, it also issued an order to show cause, directed to the pipeline companies, for the purpose of obtaining information with which to solve the problem which its method of fixing allowables had created.

Under such order the various purchasers to whom it was directed were required to produce certain information set forth therein not less than five days prior to March 30, 1956. On Mach 30, 1956, the show cause docket was consolidated with the market demand hearing for the six months' period from April 1, 1956, to September 30, 1956. Thereafter such matters were heard on a common record, although various docket numbers were assigned to such hearings for the separate six months' market demand hearings.

The April, 1956, monthly allowable order used the "old method" but was entitled "Interim Order" as were the monthly orders to and including November, 1957. After April, 1956, the Commission started experimenting with its method of determining allowables. It merely increased the market demand figure for three months (May, June, and July, 1956). A questionable procedure as it was without factual support. Next the Commission returned to the "old method" of letting nominations control the market demand figure, but stopped adjusting the market demand figure, in arriving at the allowable, by deducting underages or adding overages for the prior month. The current allowable was the nomination plus any canceled underage, for the preceding month, to be respread to the field pursuant to the basic order. This current allowable was spread to all wells in the field. This procedure was followed from August, 1956, through February, 1958, with the exception that in February and March, 1957, the Commission disregarded a zero nomination filed by Colorado Interstate and used instead its runs for a prior comparable period.

After its Report and Order, effective February 1, 1958, closing the show-cause docket, the Commission started determining the market demand by considering nominations, the rate of increase in total consumer markets of the pipeline companies compared to the rate of increase in their takes from the Kansas-Hugoton, the takes from other sources of supply, and other factors. The Commission continued the practice of not adjusting the market demand figure in arriving at the allowable by deducting the underages or adding

the overages for the prior month. This procedure was followed from March, 1958, through January, 1959, and has continued.

Colorado Interstate and Northern Natural filed separate petitions for review of the orders under consideration in the district court of Finney County. Panhandle and the Southwestern Kansas Royalty Owners Association (hereinafter referred to as Royalty Owners) intervened.

The cases were not consolidated but were tried on a common record. The lower court "reversed and set aside" all of the orders and further directed, as to the monthly allowable orders, that:

". . . the allowables set forth therein are void insofar as they are in excess of the allowables which would have been established under the method of calculating allowables used by the State Corporation Commission prior to May of 1956."

Following the overruling of motions for new trials, the Commission, Panhandle, and the Royalty Owners, appellants, filed separate appeals, abstracts, and briefs. Northern Natural and Colorado Interstate, appellees, filed separate counter-abstracts and briefs. The contentions of each of the three appellants are similar in nature and will not be separately considered. The same is true of the contention of the appellees.

Certain procedural questions have been raised which will first be given attention. Although the decision on the merits may render their determinations unnecessary, it is advisable that the proper procedure be outlined in order that the courts shall not again be faced with the chaotic situation that exists here.

The appellants contend that the allowable orders issued prior to November, 1957, are not subject to judicial review because no timely application for rehearing was filed with the Commission. We agree with appellants' contention.

Proceedings for judicial review of orders of the Commission are authorized by G. S. 1949, 55-707. It provides that such actions " . . . may be brought and proceedings respecting same shall be governed by and appeals may be taken as provided in section 55-606 of the General Statutes of Kansas of 1935, as amended [now G. S. 1949, 55-606], and that each and all of the provisions of said section, as so amended, shall apply to and govern such actions arising under this act."

With respect to actions for judicial review of the orders of the Commission, G. S. 1949, 55-606, provides:

". . . Before any such action may be brought by a person who was a party to the proceeding resulting in the making of a . . . order . . . of the commission, *a petition for rehearing shall first be filed with the commission within ten days from the date of the making of the . . . order . . . in question.* A rehearing shall be granted or denied by the commission within ten days from the date said petition is filed and if rehearing be not granted within ten days it shall be taken as denied. If rehearing be granted the matter shall be set for hearing as promptly as shall be convenient, and shall be determined by the commission within thirty days after the same shall be submitted. Such action may be brought by any person aggrieved, whether or not such person was the applicant for rehearing, within thirty days after the denial of the petition for rehearing, or, if rehearing is granted, then within thirty days after the final decision by the commission. . . ." (Emphasis ours.)

No petition for rehearing of any of the orders entered prior to November, 1957, were filed within the time prescribed by G. S. 1949, 55-606. The statute makes the filing of a timely petition for rehearing a prerequisite to the filing of a petition for judicial review.

The court had no authority to review the orders of the Commission except in the manner and to the extent the statute gave it such authority. (*City of McPherson v. State Corporation Commission,* 174 Kan. 407, 414, 257 P. 2d 123.)

In *Continental Investment Corp. v. State Corporation Comm.,* 156 Kan. 858, 137 P. 2d 166 it is stated:

". . . When a person has a grievance against an order or ruling of an official board, he must seek redress in conformity with the procedure prescribed by the pertinent statute. In this case, that procedure is laid down in G. S. 1941 Supp., 55-605, 55-606 . . ." (p. 868.)

In *United States v. Tucker Truck Lines,* 344 U. S. 33, 36, 37, 97 L. Ed. 54, 73 S. Ct. 67, the court stated the rule as follows:

"We have recognized in more than a few decisions, and Congress has recognized in more than a few statutes, that orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts. . . ." (See also *F. P. C. v. Colorado Interstate Gas Co.,* 348 U. S. 492, 99 L. Ed. 583, 75 S. Ct. 467.)

The appellees do not contend that they filed timely petitions for rehearing at the time the monthly allowable orders were issued. They contend that these orders were interim, and not appealable until finalized by the Commission's general order, effective February 1, 1958.

The orders were designated "Interim Orders." The district court ruled that this designation indicated that the orders were not final.

We are concerned with the nature, character, and effect of the order and not with its name. (*Hayward v. State Corporation Comm.*, 151 Kan. 1008, 1013, 101 P. 2d 1041.) G. S. 1949, 55-606, does not require that an order must be a "final" in order to be subject to review. It authorizes the review of "any" order by any person aggrieved by such order. It is not concerned with appeals, or appealable orders, nor with the definition of a final order in appellate procedure, or the jurisdiction of the courts with respect to such under the Code of Civil Procedure.

Whether or not a particular determination made by an administrative body is an "order" subject to review is determined by the substance of what that agency purports to do, or has done by the order, and not by the label placed upon it. Under the review procedure, an order is reviewable which determines rights or obligations or fixes some legal relationship as a consummation of the administrative process. (*C. & S. Air Lines v. Waterman Corp.*, 333 U. S. 103, 92 L. Ed. 568, 377, 68 S. Ct. 431.)

The Supreme Court of the United States, in *Pennsylvania R. Co. v. United States*, 363 U. S. 202, 4 L. Ed. 2d 1165, 80 S. Ct. 1131, stated the applicable principle as follows:

". . . We decided some years ago that while a mere 'abstract declaration' on some issue by the Commission may not be judicially reviewable, an order that determines a 'right or obligation' so that 'legal consequences' will flow from it is reviewable. . . ." (p. 205.)

Each of the monthly allowable orders contained the following statement:

"That an interim order should be entered herein determining a schedule of production allowable to wells in the Hugoton Gas Field for the month of [particular month specified] 1957, but determinative of no other issue in Docket 51,488-C (c-4916) now pending before the Commission."

It is quite definite that the Commission intended the monthly allowable order to be final but not to determine or close the investigation under the show-cause docket. As timely petitions for rehearing were not filed covering the monthly allowable orders for May, 1956, through October, 1957, the orders were not subject to judicial review.

The district court reviewed the report and order of the Commission effective February 1, 1958, in which the Commission closed the show-cause docket, found the order void, and adjudged that it be set aside. The appellants contend that the order was not a

proper subject for judicial review because it did not affect the rights of the parties but merely outlined the prospective action of the Commission. Appellants' contention is correct. The report and order does not of itself adversely affect anyone. An adverse affect will follow only if some future action is taken by the Commission.

The report and order reviewed the proceedings which took place under the show-cause order issued March 16, 1956; stated the questions presented for determination; set out findings of fact and the evidence to support them; stated the market demand factors to be considered in the future; presented the method for calculation of allowables, and considered the balancing period for over and under production of wells.

Some additional action in the way of fixing definite allowables had to be taken before the order could have any actual effect. If the adverse effect will follow only if some future action is taken by the Commission, the order is not subject to judicial review. This issue was determined in *Hayward v. State Corporation Comm.*, 151 Kan. 1008, 101 P. 2d 1041, where this court had under consideration the first basic order issued by the Commission in connection with the Kansas-Hugoton Gas Field. The court stated the Commission's contention as follows:

"Appellant [Commission] contends the basic order was not self-executing, but was merely a standard, formula or guide pursuant to which the schedule of well allowables was to be determined and thereafter promulgated; that the commission had not completed its work, in that it had not yet determined and hence had not issued its schedule of well allowables. . . ." (p. 1014.)

The court held that the duties of the Commission were prematurely and improvidently stayed, stating:

". . . The fundamental principle that courts have no right to interfere by injunction with administrative and legislative functions yet to be performed by the corporation commission, is well established. (*State, ex rel., v. Flannelly*, 96 Kan. 372, 386-387, 152 Pac. 22; *Kansas City v. Utilities Commission, State, ex rel., v. Capital Gas & Elec. Co.*, 139 Kan. 870, 888, 33 P. 2d 731; *State Comm'n v. Wichita Gas Co.*, 290 U. S. 561, 78 L. Ed. 500, 504-505.) Cases involving completed administrative and legislative functions are not in point. . . ." (l. c. 1015.)

The decision appears to be in harmony with the decisions of the Supreme Court of the United States.

In *Rochester Tel. Corp. v. U. S.*, 307 U. S. 125, 83 L. Ed. 1147, 59 S. Ct. 754, the court said:

". . . the order sought to be reviewed does not of itself adversely affect complainant, but only affects his rights adversely on the contingency of future administrative action. In view of traditional conceptions of federal judicial power, resort to the courts on these situations is either premature or wholly beyond their province." (p. 130.) (See also, *C. & S. Air Lines v. Waterman Corp.,* 333 U. S. 103, 92 L. Ed. 568, 68 S. Ct. 431 and *United States v. Los Angeles R. R.,* 273 U. S. 299, 71 L. Ed. 651, 47 S. Ct. 413.)

In the appeals Nos. 41,515 and 41,516, the monthly allowable orders for the months beginning May, 1956, and extending through November, 1957, and in appeals Nos. 41,555 and 41,556, the monthly allowable orders for the months October, November, and December, 1958, and January, 1959, were found by the district court to be void, and reversed and set them aside, stating:

". . . that the allowables set forth therein are void insofar as they are in excess of the allowables which would have been established under the method of calculating allowables used by the Commission prior to May of 1956." (Although the wording is not exactly the same in all the judgments, the result is the same in each.)

The administration of the law with respect to the production and conservation of natural gas is classified in that recognized area of regulation which necessitates the authority to exercise a considerable degree of discretion. The legislature delegated that authority to the Commission and with great latitude for the exercise of discretion through the promulgation of rules, regulations, orders, and decisions. In recognition of that authority, in providing for judicial review of the Commission's actions, it specifically limited the authority of the reviewing court by providing that:

". . . The authority of the court shall be limited to a judgment either affirming or setting aside in whole or in part the rule, regulation, order or decision of the commission. . . ." (G. S. 1949, 55-606.)

The record before us shows that prior to May, 1956, the Commission followed a pattern or formula in the setting of allowables and that after May, 1956, it adopted a different formula. The nature of the difference is not material at this point. It is sufficient to state, and it is agreed, that a change was made and that it produced different results.

The appellants contend that the district court, by its order, reduced the allowables to a determinable figure, made its own determination of what the allowables should be, and determined what formula should be used. We are forced to agree.

G. S. 1949, 55-606 gives the reviewing court authority to set aside

any unlawful or arbitrary or unreasonable order, in whole or in part. But it does not give the court authority to substitute its judgment for that of the Commission by directing the Commission to enter a certain type of an allowable order, or by prescribing the formula which it must follow. The court has the authority to set aside only a part of the order. If, in this case, the court had set aside the entire allowable but let the remainder of the order stand, it would have been well within its jurisdiction. When the court determined the amount of the allowable by setting aside, not a part of the order but a part of the allowable, it is a clear invasion of the administrative function. This court considered the question in *White Eagle Oil Co. v. State Corporation Comm.*, 168 Kan. 548, 214 P. 2d 337, where the district court set aside the orders of the Commission for the reason they denied the assignment of an allowable to a well on the basis of 640 acres as attributable thereto. The court said:

". . . That portion of it [the order] which directed the commission after consideration to enter its order assigning to the gas well an allowable based on the attribution thereto of the north half of section ten and the south half of section 6 was incorrect. The order should have been simply that the action was remanded to the commission with directions that it further consider its order." (p. 557.)

In *City of McPherson v. State Corporation Commission*, 174 Kan. 407, 257 P. 2d 123, in considering the authority of the reviewing court under a similar statute, this court said:

". . . Its function was to consider what the Commission had considered, not to inject its own views into what should have been considered by the Commission. The court had no authority under the statute to review the work of the Commission except in the manner and to the extent the statute gave it such authority. . . ." (p. 414.)

The power of a court to replace the Commission's orders with its own, with respect to the establishment of allowables, has been ruled on specifically by courts in other oil and gas producing states having proration. In *Marrs v. R. R. Commission*, 142 Tex. 293, 177 S. W. 2d 941, the district court reversed the monthly allowable orders and also held that the Commisson could not set the allowables below 35,000 barrels daily. The Texas Supreme Court agreed that the allowable orders should be reversed, but as to the lower court's attempt to prescribe the terms of the Commission's allowable orders, it said:

". . . A court has the right to review the action of the Railroad Com-

mission, and to strike its orders down if they are illegal; but it has no authority to write a proration order for the Commission, nor to prescribe the terms of a subsequent order to be entered by the Commission. . . .

"The responsibility rests with the Commission to devise some scheme of proration that will conserve the oil in the field in question, and at the same time will be fair and just and will not deprive petitioners of their property. There are many and varied methods that may be adopted by the Commission to accomplish this purpose. This necessarily involves the exercise of the discretion that has been committed by the Legislature to the Commission, and it would amount to a usurpation of the Commission's power by the court, for the court to undertake to prescribe the terms of such an order." (pp. 306, 307.) (See also, *Brown et al. v. Humble Oil Co.*, 126 Tex. 296, 83 S. W. 2d 935, and *Interstate Comm. Comm. v. Ill. Cent. R. R.*, 215 U. S. 452, 54 L. Ed. 280, 30 S. Ct. 155.)

In connection with numerous cases pending before the court for judicial review, the appellant, Panhandle, filed motions requesting the court to make findings of fact and conclusions of law. The district court overruled the motions and entered its judgments setting aside the orders of the Commission. Panhandle claims error.

G. S. 1949, 55-606, which is made applicable to the review of the Commission's orders regulating the production of gas by G. S. 1949, 55-707, makes no specific provision for findings of fact and conclusions of law by the reviewing court. The statute provides its own procedure for judicial review and the provisions of the Code of Civil Procedure are not applicable where the procedure is covered by the statute. However, the statute further provides, ". . . All actions brought under this section shall have precedence in any court and on motion shall be advanced over any civil case of different nature pending in such court, and *such action shall be tried and determined as other civil actions*. . . ." (Emphasis ours.) The purpose of this provision appears to be clear. Such procedural matters as are not covered by the oil and gas review statute are to be governed by the Rules of Civil Procedure as "such actions shall be tried and determined as other civil actions." Any other interpretation placed upon the provision would leave it without any force or effect.

G. S. 1949, 60-2921, provides:

"Upon the trial of questions of fact by the court, it shall not be necessary for the court to state its finding, except generally, for the plaintiff or defendant, unless one of the parties request it, in which case the court shall state, in writing, the conclusions of fact found, separately from the conclusions of law."

This court considered the review statute in *Wakefield v. State*

*Corporation Comm.,* 151 Kan. 1003, 101 P. 2d 880, and stated at page 1007:

". . . The twelfth sentence, in providing that the district court shall not be bound by any finding of fact made by the commission, clearly indicates it was intended the district court should review the record before the commission in order to make its own independent findings of fact. . . ."

It was the failure of the trial court to make findings of fact and conclusions of law that has resulted in the voluminous record now before us. The result of the failure is well stated in Panhandle's brief as follows:

"The cross petition of Panhandle Eastern in the Finney County Court attacked the Commission's market demand determination and raised an issue of fact. We doubt very much if the court ever considered the evidence regarding market demand. As long as the trial court adhered to the view that the runs must control the allowables, any question about market demand would be academic and such review would serve no practical purpose. It is necessary, however, to preserve the issue because it is of paramount importance if the runs do not control. The attorneys for this appellant vainly endeavored to find out the basis of the decision. Because of this failure, it has been necessary to abstract in detail a most voluminous record together with all various orders, pleadings and other papers, most of which may prove to be immaterial, but which could not safely be omitted. This is exactly the situation the statute is intended to prevent. . . ."

We must conclude that if the reviewing court does not adopt the findings of fact and conclusions of law of the Commission, it must make its own findings of fact and conclusions of law upon the request of any interested party.

Other important procedural questions pertaining to piecemeal review by various parties in multiple actions in separate district courts have been raised. They have not been ignored. However, the factual issues by which they are raised are not without dispute. The same questions are raised in the appeals in similar cases which were filed later and in which the facts are not in dispute. The remaining procedural question will be discussed in the opinion disposing of the appeals in the later cases. (*Colorado Interstate Gas Co. v. State Corporation Comm.,* 192 Kan. 29, 386 P. 2d 288.)

We may now proceed to discuss the basic issues presented.

Certain monthly allowable orders (November, 1957, through January, 1958) issued by the Commission before its report and order, effective February 1, 1958, was entered, were before the district court for review, and are before this court on appeal. How-

ever, as the Commission followed the same formula in determining these monthly allowables as it did in determining the monthly allowables after it entered its report and order, it would serve no useful purpose to extend further this lengthy opinion by a separate discussion of them. We will consider the market demand determinations and the allowables made for the months beginning March, 1958, and extending through January, 1959.

The Commission's method of determining market demand and establishing allowables for the Kansas-Hugoton Field present the basic issues.

It may be stated as a general proposition of law that the determination of market demand and establishing allowables is a responsibility which the legislature has lodged in the Commission. The courts are without jurisdiction to determine the method the Commission should use or the factors which it should consider. The courts may examine the methods used for the purpose of determining whether the Commission has acted within the power and authority delegated to it by the legislature.

In considering the validity of the Commission's determination, the courts can consider only the statutes granting the Commission's authority and the Commission's basic order with such amendments as are properly made thereto. The determination is a question of fact. What facts are to be considered and the relative weight to be accorded them are matters left to the Commission's discretion. Unless the determination is arbitrarily or capriciously made without supporting evidence, the courts cannot interfere and substitute their judgment for that of the Commission. The question for the reviewing court is the power of the Commission to make the order, not its wisdom, propriety or expediency in having made it. (*Interstate Comm. Comm. v. Ill. Cent. R. R.*, 215 U. S. 452, 54 L. Ed. 280, 30 S. Ct. 155.) In *City of McPherson v. State Corporation Commission*, 174 Kan. 407, 257 P. 2d 123, in considering the authority of the reviewing court under a similar statute, this court said:

". . . Its function was to consider what the Commission had considered, not to inject its own views into what should have been considered by the Commission. The court had no authority under the statute to review the work of the Commission except in the manner and to the extent the statute gave it such authority. . . ." (p. 414.)

It will perhaps be less confusing if we first consider the Commission's authoity, the manner in which it determined market demand, and the evidence which it considered.

It should be noted that G. S. 1949, 55-703, is the only section in the statute pertaining to production and conservation of gas which makes direct use of the phrase "market demand." The determination of market demand is not the end result sought by the statute. It is rather the determination of the conditions under which the Commission shall take jurisdiction of production in a gas field.

The Commission shall regulate the taking of natural gas, ". . . [1] whenever the available production of natural gas from any common source of supply is in excess of the market demands for such gas from such common source of supply, or [2] whenever the market demands for natural gas from any common source of supply can be fulfilled only by the production of natural gas therefrom under conditions constituting waste as herein defined, or [3] whenever the commission finds and determines that the orderly development of, and production of natural gas from, any common source of supply requires the exercise of its jurisdiction, . . ." (G. S. 1949, 55-703.)

The Commission's basic order made use of the phrase "market demand" only in the following particular:

". . . At such time and place as the Commission shall fix, the Commission will, after notice, conduct a hearing to determine the market demand for natural gas from said field for the next six succeeding proration periods, or for such other period of time as the Commission shall prescribe, . . ."

Neither the statute nor the basic order defined "market demand." The term has rather a common understood meaning. Market demand is that amount of a commodity which the consuming public is able and willing to buy.

The word "demand" as used in a commercial sense is defined by Webster's New Century Dictionary (Unabridged) Second Edition:

". . . in economics, (a) the desire for a commodity together with ability to pay for it; (b) the amount people are ready and able to buy at a certain price. Opposed to *supply.* . . ."

The price and the availability of gas in the Kansas-Hugoton Field is not a deterring market factor. However, the consuming public cannot buy unless the gas is transported from the field to the market. Therefore the market demand for gas in the Kansas-Hugoton Field must be that amount which the consuming public is able and willing to purchase, restricted to the amount which the pipeline companies in the field are able to transport to the market.

Neither the statute nor the basic order state the formula or factors which the Commission shall use in determining market demand, nor

the evidence which shall be considered. These matters are left to the discretion of the Commission.

The factors which the Commission used in determining market demand, in addition to those used prior to 1956, will next be considered.

Following the issuance of the show-cause order in March of 1956, the Commission held extensive hearings covering the situation in the Kansas-Hugoton Field in general and the market demand in particular. It issued its report and order, covering the matter, effective February 1, 1958. The Commission, among other findings, found and concluded in connection with the determination of market demand:

"A review of the Commission's past allowable orders and the evidence presented in these dockets discloses that heretofore the nominations by the purchasers from the Hugoton Field have been used and considered by the Commission as the market demand for the field. However, the evidence presented in these dockets discloses that in many instances the aforesaid nominations did not approximate the market demand. Therefore, the Commission finds that it is necessary, in determining the market demand for natural gas from the Hugoton Field, to consider, in addition to the nominations by the purchasers, the following factors:

"(1) Takes from other sources of supply to which the purchasers are connected.

"(2) The total markets for natural gas of all purchasers from the Kansas-Hugoton Field; the rate of increase therein compared to the rate of increase in the takes from the Kansas portion of the Hugoton Field.

"(3) Takes from other sources of supply in Kansas.

"(4) Any other factors, conditions and/or circumstances that would aid the Commission in establishing the market demand."

There is ample evidence to support the Commission's conclusion that in many instances the nominations did not approximate the market demand in the field. We will not review the evidence here as it will be discussed in considering allowables. The question presented at this point is whether the Commission erroneously considered the factors quoted above in addition to the nominations by the pipeline companies.

The appellees contend that the pipeline companies' nominations are the only evidence of market demand that should be considered. We do not agree. The Commission endeavors to determine market demand for six months in the future. It must of necessity give some consideration to the entire market demand, the capacity of the pipelines in the field, possible addition of new consumers, increase in

consumer demand, prospective weather conditions, and all factors that may affect the consumer, if its determination is to have veracity.

The Commission gave consideration to the new factors mentioned in its report and order, "in addition to the nomination of the purchasers." The record does not disclose what weight the Commission gave the new factors. It is not necessary that the Commission state just what weight it gives each factor covered by the evidence. If the evidence is admissible, it is for the Commission to determine the weight it shall be given, not the courts.

It would appear that the Commission used the additional factors mentioned largely for the purpose of checking the accuracy of the nominations. We have checked the nominations against the Commission's finding of market demand for the first nine months of 1958, and find no startling difference. During the winter months, January, February, and March, while the demand was well in excess of 40,000,000 MCF, the nominations and the market demand found by the Commission were substantially the same. During the months of April through September, the monthly market demand found by the Commission exceeded the nominations by approximately 2,000,000 MCF. Panhandle, one of the major pipeline companies in the field, contends that the market demand, as determined by the Commission, is unreasonably low and that it cannot take enough gas to meet the demand of its market.

We find nothing in the record to indicate that the Commission acted arbitrarily and capriciously in determining the market demand for the field.

Appellees contend that the Commission unlawfully changed its method of determining allowables.

The only change the Commission made in determining allowables was that it ceased adding over production from wells for the preceding month to the current allowables and ceased deducting under production of wells for the preceding month from the current allowables.

It is clear that the method which the Commission used in determining market demand and calculating allowables prior to 1956, did not permit the producers to supply the market demand for gas in the Kansas-Hugoton Field and drove the pipeline companies to other fields to obtain a sufficient supply for their customers. It is clearly established by the record that from time to time during the

period of 1944 to 1956, every pipeline in the field at one time or another required additional substantial amounts of gas to supply their added markets but that the gas could not be obtained from the Kansas-Hugoton Field because of the Commission's method of determining market demand and calculating allowables and that they were therefore forced to go to other fields for their supply. Counsel for Northern Natural stated in oral argument before this court that the company had at times taken on additional territory requiring a substantial amount of additional gas but that because the market could not be supplied from the Kansas-Hugoton Field, under the Commission's orders, they went to other sources of supply for their requirements.

Later, and in accordance with its Report and Order effective February 1, 1958, the Commission ceased deducting underages occurring from wells which had not produced the previous months allowable and by so doing arrived at an allowable which represented the true demand for gas in the field.

There is nothing in the Gas Conservation Statute nor in the Commission's basic order which authorizes the Commission to deduct past underages from current allowables which were determined to be necessary to supply the market demand. Such a practice would permit, and did permit, one major pipeline company to reduce its takes and force the same reduction on every other pipeline company in the field regardless of the market demand requirements as a whole.

The Commission stated the fallacy in the old method of determining current allowables and set out the proper formula to be followed in its Report and Order effective February 1, 1958:

"The market demand figure, once obtained, heretofore was used to determine the current allowable to be assigned by the Commission to the field. Prior to May, 1956, the current allowable was determined by taking the market demand, first adding thereto the cancelled underages for the previous month and then subtracting therefrom the amount of underproduction or adding thereto the amount of overproduction for the previous month. The result of the use of this method was that in actuality the runs or takes from the field controlled the amount of the current allowable; the control of the market demand and current allowable was entirely exclusively in the hands of the purchaser pipeline companies, and not in the Commission.

"The Commission, in an effort to take control, deviated from this formula of determining current allowables and for August, 1956, and subsequent months has fixed current allowables by taking the market demand figures, still based exclusively on nominations of the purchasers, and adding thereto the cancelled

underproduction for the previous month. Actually, except for the considera-
tion of a small amount of cancelled underproduction, the market demand,
based solely on the nominations of the purchasers, was the current allowable
for the field. The current allowable for each well was calculated in accordance
with the provisions of paragraph (1) of the Basic Order for the Hugoton Gas
Field. Each well continued to carry in addition to its current allowable such
underproduction or overproduction as may have accrued to it. The result was
the net allowable for each well. The sum total of the net allowables of the
wells therein represented the net allowable for the entire field.

"To restate this formula, allowables in the future will be determined as
follows: Consider the factors as discussed in paragraph 16 above and arrive
at the market demand figure; add to it the cancelled underages, and the result
will be the current monthly allowable. (This is the amount that is ratably
apportioned to the wells each month.) To ascertain the net allowable for the
field as a whole, add the total net underage or subtract the total net overage.
The resulting figure is the field total net allowable on that date.

"The field as a whole is never exactly in balance. It is to be expected that
for some periods of time it will have a total net underage and for other periods
of time it will have a total net overage."

Much confusion has arisen because of misuse or misunderstand-
ing of descriptive terms. The briefs of appellees in setting out
comparative schedules for the court's consideration confuse nomina-
tions with the Commission's finding of market demand and confuse
current allowables with net allowables.

The current allowable, which is spread to all of the wells in the
field, consists of the market demand as found by the Commission
plus cancelled underages for the previous month. The practice of
adding cancelled underages is in accordance with the basic order
and does not appear to be challenged.

The net allowable consists of the current allowable plus underages
pertaining to specific wells which have not been cancelled. Such
underages have been allocated in past months and was only avail-
able to the wells to which it was previously allocated. Such wells
have an opportunity to produce the underage in addition to the
current allowable if they can do so before the specified time for
cancellation.

The Commission's method of determining current allowables, as
stated above, complies with the law and the basic order.

The appellees contend that the Commission was influenced in its
determinations by the fact that gas from the Kansas-Hugoton Field
was draining or would drain into the Guymon-Hugoton Field in
Oklahoma, and be wasted or lost insofar as the Kansas well owners

and royalty owners are concerned. This was a proper matter for the Commission to consider under the circumstances.

The Commission found, and there was ample evidence to support the findings, that because of its past methods of determining market demand and calculating allowables, the producers in the Kansas-Hugoton Field had not been able to produce the market demand and the pipeline companies had been forced to go to other fields, including the Guymon-Hugoton Field, to supply their market. The gas in the Guymon-Hugoton Field was being depleted and the pressure was declining at a much faster rate than in the Kansas-Hugoton Field. Drainage is bound to result.

This court would not place its approval on an order of the Commission which had as its purpose the drainage of gas from Oklahoma into Kansas. However, the Commission should not be criticized for correcting an improper method of establishing allowables which created a situation under which Kansas gas was caused to drain into Oklahoma.

There is no quarrel or conflict of jurisdiction between the two states. The Oklahoma authorities have done nothing to create the unfortunate situation which exists in the Kansas-Hugoton Field. The situation was created by the allowable orders of the Kansas Commission and should be corrected by it insofar as reasonably possible under the law.

The appellees contend that the change in the Commission's method of calculating allowables will cause inequitable or unfair taking among the producers in the field. The right of the pipeline companies to challenge matters which do not affect them but affect only the producers and royalty owners is somewhat questionable. The producers have not participated in the litigation, but the royalty owners have filed extensive briefs in support of the Commission's orders. We will, however, discuss the contention.

The Commission has three responsibilities under the Gas Conservation Statute. It must first of all prevent waste of the natural resource. It must allow sufficient production to meet the market demand if such can be done without waste. It must protect correlative rights.

In a gas field such as the Kansas-Hugoton where five major companies are taking gas through separate pipelines not connected to the same wells, the responsibilities placed upon the Commission will clash. If the market demand cannot be supplied without waste,

or if correlative rights cannot be protected without waste, or if correlative rights cannot be protected without unduly restricting production needed for the market demand, one of the three, waste, market demand, or correlative rights, must suffer. The dominate purpose of the Gas Conservation Statute is to prevent waste. (*Kansas-Nebraska Natural Gas Co. v. State Corporation Commission*, 169 Kan. 722, 222 P. 2d 704.)

The Commission cannot require or guarantee that each well owner will produce and sell his entire allowable. The Commission is required to afford each owner the "right or opportunity" to produce his share. As far as the Commission's duty under the basic order goes, it is fulfilled when each owner is legally "free to produce" and not denied the "right or opportunity" to produce his allowable.

The Commission could not be required to shut in an entire gas field to protect correlative rights where some of the producers desired to cease production and hold a gas field for a reserve. The Commission could not be required to unduly restrict production in a gas field because some producers desired to deplete the gas as a very low rate regardless of the reason.

When waste, market demand, and correlative rights are in conflict the Commission must determine which is to be given preference. If the decision of the Commission is supported by evidence, the courts cannot interfere.

The orders of the Commission, under consideration, are not subject to the objection that they do not properly protect correlative rights under the facts disclosed by the record.

The appellees contend that the orders of the Commission violate the commerce clause of the federal constitution and the Natural Gas Act.

Our attention is called to the fact that the subject of regulating interstate commerce is committed by the United States Constitution to the control of the federal government. (*Oklahoma v. Kansas Nat. Gas Co.*, 221 U. S. 229, 55 L. Ed. 716, 31 S. Ct. 564; *Penna. v. West Virginia*, 262 U. S. 553, 67 L. Ed. 1117, 43 S. Ct. 658; and *Penna. Gas Co. v. Pub. Service Comm.*, 252 U. S. 23, 64 L. Ed. 434, 40 S. Ct. 279.) Also, that the states have no authority, even in the absence of federal legislation, to regulate sales of gas for transportation and resale in interstate commerce. (*Missouri v. Kansas Gas Co.*, 265 U. S. 298, 68 L. Ed. 1027, 44 S. Ct. 544; *Pub. Util. Comm. v. Attleboro Co.*, 273 U. S. 83, 71 L. Ed. 549, 47 S. Ct. 294; and *State*

*Comm'n v. Wichita Gas Co.,* 290 U. S. 561, 78 L. Ed. 500, 54 S. Ct. 321.) We are further informed that the states cannot so regulate under its police power as to place an undue burden on interstate commerce. (*Dahnke-Walker Co. v. Bondurant,* 257 U. S. 282, 66 L. Ed. 239, 42 S. Ct. 106; and *Lemke v. Farmers Grain Co.,* 258 U. S. 50, 66 L. Ed. 458, 42 S. Ct. 244.)

No one appears to question these general propositions of law. However, they are not applicable here. The Commission's orders are not directed to the pipeline companies. The pipeline companies are not required to do anything, neither are they restricted in any way. None of the pipeline companies, except Panhandle, claim they are not able to take enough gas under the Commission's order to meet their present market demands. Panhandle is before this court in support of the Commission's action.

The facts in this case present a much different situation than those which existed in *Northern Natural Gas Co. v. State Corp. Comm'n of Kansas,* 372 U. S. 84, 9 L. Ed. 2d 601, 83 S. Ct. 646. In the Northern Natural Gas case the Commission's order was directed to the pipeline company in an attempt to force it to take gas ratably from the wells to which it was connected in the Kansas-Hugoton Field.

The Commission's orders now before us are addressed only to the producers. The producers are not complaining and the royalty owners are supporting the Commission's action. The Commission's orders in no way attempt to regulate the sale or transportation of gas. The Supreme Court of the United States clearly stated the applicable law in *Champlin Rfg. Co. v. Commission,* 286 U. S. 210, 76 L. Ed. 1062, 52 S. Ct. 559:

"Plaintiff contends that the Act and proration orders operate to burden interstate commerce in crude oil and its products in violation of the commerce clause. [U. S. Const. art. I, § 8.] It is clear that the regulations prescribed and authorized by the Act and the proration established by the commission apply only to production and not to sales or transportation of crude oil or its products. Such production is essentially a mining operation and therefore is not a part of interstate commerce even though the product obtained is intended to be and in fact is immediately shipped in such commerce. *Oliver Iron Co. v. Lord,* 262 U. S. 172, 178. *Hope Gas Co. v. Hall,* 274 U. S. 284, 288. *Foster Packing Co. v. Haydel,* 278 U. S. 1, 10. *Utah Power & Light Co. v. Pfost,* supra. No violation of the Commerce clause is shown." (p. 235.)

Appellees contend:

"It is abundantly clear . . . that the jurisdiction over sales of natural gas for resale in interstate commerce pursuant to the Natural Gas Act is

exclusively in the Federal Power Commission. The Natural Gas Act was passed pursuant to the Commerce Clause contained in the United States Constitution and obviously was intended to occupy the entire area—the area involved in the instant appeals."

The Natural Gas Act and the decisions do not support the contention. Congress has not occupied the field in the area of state control of the production of natural gas. The Natural Gas Act specifically exempts from its coverage the production or gathering of natural gas. (15 U. S. C. A. § 717b.)

In *Panhandle Pipe Line Co. v. Comm'n*, 332 U. S. 507, 92 L. Ed. 128, 68 S. Ct. 190, the court reviewed the legislative history of the Natural Gas Act and said:

". . . Three things and three only Congress drew within its own regulatory power, delegated by the Act to its agent, the Federal Power Commission. These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale." (p. 516.)

The court further said:

"Moreover, this unusual legislative precision was not employed with any view to relieving or exempting any segment of the industry from regulation. The Act, though extending federal regulation, had no purpose or effect to cut down state power. On the contrary, perhaps its primary purpose was to aid in making state regulation effective, by adding the weight of federal regulation to supplement and reinforce it in the gap created by the prior decisions." (p. 517.)

The regulation of the production of gas was clearly left within the jurisdiction of the states.

The appellees last contend that the orders of the Commission violate the fourteenth amendment to the United States Constitution which provides, ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law; . . ." and article 1, section 10 which provides, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts. . . ."

Appellee's contention appears to be bottomed on the proposition that they have contracts to purchase the gas produced from certain leases in the field and they therefore have the right to determine the allowable production therefrom through their nominations, without interference by the Commission. Also, that their gas purchase contracts have various provisions which may be affected if their ability to determine the allowables is disturbed.

Individuals cannot by private contracts destroy the right of the state to exercise reasonable police power for the welfare of the

public. It has been said, ". . . that an exercise of public policy cannot be resisted because of conduct or contracts done or made upon the faith of former exercises of it, upon the ground that its later exercises deprive of property or invalidate those contracts. *Louisville & Nashville R. R. Co. v. Mottley*, 219 U. S. 467, [55 L. Ed. 297, 31 S. Ct. 265, 34 L. R. A. (N. S.) 671.]" (*Thornton v. Duffy*, 254 U. S. 361, 369, 65 L. Ed. 304, 41 S. Ct. 137.) (See also, 16 C. J. S., §§ 180-182, 913 and 917, Constitutional Law; *Phillips Petroleum Co. v. Jenkins*, 297 U. S. 629, 80 L. Ed. 943, 56 S. Ct. 611; *Bennett v. Corporation Commission*, 157 Kan. 589, 142 P. 2d 810; *Champlin Rfg. Co. v. Commisison*, 286 U. S. 210, 76 L. Ed. 1062, 52 S. Ct. 559, 86 A. L. R. 403.) The appellees do not complain that the production of gas is being over-regulated by undue restrictions. They rather complain that the field is being under-regulated. Private individuals cannot by private contracts obtain a vested right in a police or public walfare statute. The Kansas Legislature could repeal the Gas Conservation Statute if it thought such action advisable.

There are no purchase contracts shown in the record. The standard gas purchase contracts which have been before this court contain a provision making the contract subject to all present and future valid orders of regulatory bodies.

There is no statute or provision in the basic order providing that, regardless of the evidence presented at the market demand hearings, the Commission must allow past under production to control future allowables. The Gas Conservation Statute and basic order both require the Commission to determine the market demand and establish current allowables based on the evidence presented at the market demand hearings.

The Commission is, and of necessity must be, free to correct past errors. Orders may have been entered with full confidence that they would effectuate the legislative mandate, but twelve years of irrefutable experience demonstrated that something was wrong.

In *Continental Investment Corp. v. State Corporation Comm.*, 156 Kan. 858, 137 P. 2d 166, this court said that:

". . . Of necessity all administrative rules of official boards are experimental, and their wisdom and justice or lack of it may only be revealed by trial and error. That is the main reason the legislature conferred on such official boards the power to make rules having temporarily the force of law. Otherwise there would be no excuse for the legislature placing that responsibility on an official board when the power and duty to legislate is vested in the

legislature itself. The legislative device of assigning to official boards or commissions the powers to make administrative rules governing matters of public concern, with authority to change those rules as experience may justify, is a settled policy in American jurisprudence. . . ." (p. 866.)

In reviewing another rule of the Commission, under the Gas Conservation Act, this court held that:

". . . [The] rules and regulations of the commission are never *res judicata*. Should bad consequences follow from such an order being made the commission might change it to meet conditions as they exist." (*Aylward Production Corp. v. Corporation Commission*, 162 Kan. 428, 440, 176 P. 2d 861.)

Furthermore, the orders before the Commission did not repeal or change its basic rules or regulations. There never was a rule containing the word "nominations," much less saying that nominations had to be accepted as the market demand. There never was a rule implying that the Commission was required to reduce its finding of market demand by the amount of past under-production.

We find nothing in the record which would justify the district court's judgment setting aside the orders of the Commission.

The judgment is therefore reversed with instructions to dismiss the petitions for review challenging the allowable orders of the Commission for gas production in the Kansas-Hugoton Field entered prior to and including October, 1957, and with directions to approve the allowable orders entered during the period November, 1957, through January, 1959, inclusive.

APPROVED BY THE COURT.